### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **C.G. and B.S., as parents and** | ) | |
| **next friends of A.S., a minor,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 05-237-P-S** |
| | ) | |
| **FIVE TOWN COMMUNITY** | ) | |
| **SCHOOL DISTRICT, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

C.G. and B.S., parents of student A.S. ("Parents"), challenge a decision of a Maine Department of Education ("MDOE") hearing officer ("Hearing Officer") issued pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., and its state-law analogue, 20-A M.R.S.A. § 7001 *et seq*., denying reimbursement for costs incurred in connection with their unilateral placement of A.S. at Moonridge Academy in Utah in March 2004 and declining to order an immediate therapeutic residential placement for A.S. *See* Plaintiffs' Memorandum of Law ("Parents' Brief") (Docket No. 39) at 1; Complaint, etc. ("Complaint") (Docket No. 1); Special Education Due Process Hearing [Decision] ("Hearing Decision"), *[S] & [G] v. Five Town CSD*, Case No. 05.080H (Me. Dep't of Educ. Dec. 6, 2005), at 21-22, 34.[1] After careful review of the entire record filed in this case and the parties' memoranda of law, I propose that the court adopt the following findings of fact and

---

[1] For ease of reference I shall refer to the Hearing Officer's decision, contained at pages 590-626 of Volume III of the Administrative Record ("Record"), as "Hearing Decision," citing the consecutively numbered pages of the Hearing Decision itself rather than Record pages.

conclusions of law, on the basis of which I recommend that judgment be entered in favor of the defendant Five Town Community School District ("District") as to all claims.[2]

## I.  Proposed Findings of Fact

1.      A.S. lives with her family in Camden, Maine, where she attended public school until February 2004.  Hearing Decision at 3, ¶ 1; Record, Vol. I at 79, Vol. III at 658 (testimony of C.G.).[3] The Parents are podiatrists who have offices in Rockport and Belfast, Maine.  Hearing Decision at 3, ¶ 1; Record, Vol. III at 641 (C.G. testimony).

2.      A.S. moved to Camden when she was four years old.  Hearing Decision at 3, ¶ 2; Record, Vol. I at 79, Vol. III at 641 (C.G. testimony).  Shortly thereafter, for a period of nearly six months, she was repeatedly sexually, physically and emotionally abused by a thirteen-year-old male babysitter.  Hearing Decision at 3, ¶ 2; Record, Vol. III at 641-44 (C.G. testimony).  After A.S. informed her parents of the abuse in August 1994, they notified authorities and ensured that she received weekly psychological counseling for the next three years.  Hearing Decision at 3, ¶ 2; Record, Vol. III at 642-44 (C.G. testimony).  In the months following initiation of A.S.'s counseling, details emerged that brought home to the Parents the shocking and traumatic nature of what their daughter had experienced.  Record, Vol. III at 643-44 (C.G. testimony).  A.S.'s counselor warned the Parents to be on the lookout for a reemergence of symptoms when she reached adolescence.  *Id.* at 645 (C.G. testimony).  For a period of time after the abuse was discovered, the perpetrator stalked A.S.

---

[2] Inasmuch as appears, the Parents joined the MDOE as a defendant in connection with their claim that the administrative hearing process failed to afford them due process as a result of the Hearing Officer's alleged lack of independence from the MDOE.  *See* Complaint ¶¶ 82-83; Plaintiffs' Amended Motion To Permit Presentation of Additional Evidence, etc. (Docket No. 18) at 1-2; Maine Department of Education's Opposition to Plaintiffs' Motion To Permit Presentation of Additional Evidence (Docket No. 24) at 4.  I denied the Parents' request to submit supplemental evidence bearing on the due-process claim, *see* Memorandum Decision on Motion To Supplement Record ("Record-Supplementation Decision") (Docket No. 30) at 4-5 (a decision that Judge Singal upheld on appeal, *see* Endorsement Order (Docket No. 35)), and the Parents do not press that claim in their substantive memorandum of law, *see generally* Parents' Brief.

[3] I have drawn my proposed facts from the Hearing Officer's findings to the extent relevant and supported by a preponderance of the evidence of Record, supplementing those findings with additional Record information, including facts proposed by the Parents and the (*continued on next page*)

and her family at church and at the playground, and the Parents attempted unsuccessfully to obtain a restraining order.  *Id*., Vol. II at 362, Vol. III at 644-45 (C.G. testimony).

3. After attending kindergarten at a private school, A.S. began first grade at Rockport Elementary School, part of Maine School Administrative District ("MSAD") #28.  Hearing Decision at 3, ¶ 3; Record,  Vol. II at 430, Vol. III at 643-44 (C.G. testimony).  Through third grade she consistently earned As and Bs, and her teachers reported no concerns about her learning or achievement.  Record, Vol. I at 117.  Nonetheless, after A.S. earned what her parents viewed as disappointing and discrepant results on a standardized achievement test administered in third grade, they sent her to Robert Dodge, Ph.D., for a psychoeducational evaluation in the fall of 1998, the beginning of her fourth-grade year.  Hearing Decision at 3, ¶ 3; Record, Vol. I at 117, Vol. III at 645 (C.G. testimony).  At the time, A.S. reportedly loved school and was "quite diligent about completing her work."  Hearing Decision at 3, ¶ 3; Record, Vol. I at 117.  Dr. Dodge found no evidence of any psychological problems.  Hearing Decision at 3, ¶ 3; Record, Vol. I at 118.  He administered the Wechsler Individual Achievement Test ("WIAT") and Kaufman Brief Intelligence Test ("K-BIT"), finding that A.S.'s WIAT scores were commensurate with her ability as measured by the K-BIT, which was squarely in the average range.  *Id*.  He noted no concerns about A.S. either psychologically or educationally.  Hearing Decision at 3, ¶ 3; Record, Vol. I at 118-19.

4. In fourth grade, A.S. took the Maine Educational Assessment ("MEA") examination; she was scored as not meeting standards in math and science and partially meeting standards in reading, social studies and writing.  Record, Vol. II at 430, Vol. III at 646 (C.G. testimony).

5. In December 2000, when A.S. was in sixth grade, her parents again arranged for private testing, bringing her to Christine Fink, Ph.D., for a neuropsychological evaluation.  Hearing

---

District, to the extent supported by a preponderance of the evidence.

Decision at 3, ¶ 4; Record, Vol. I at 109-16.  The Parents expressed concern about A.S.'s attention, concentration, ability to complete homework, and argumentativeness.  Hearing Decision at 3-4, ¶ 4; Record, Vol. I at 109.  Dr. Fink noted that school was a major source of stress between A.S. and her parents and that A.S. described herself as a procrastinator, preferring to engage in activities other than her homework.  Hearing Decision at 4, ¶ 4; Record, Vol. I at 109.  A.S. had been earning good grades and had made the honor roll during her first quarter in sixth grade.  *Id*.

6.     Dr. Fink administered the Wechsler Intelligence Scale for Children ("WISC-III"), the results of which placed A.S. in the solid average range, with a verbal IQ score of 101, a performance IQ score of 103 and a full-scale IQ score of 102.  Hearing Decision at 4, ¶ 4; Record, Vol. I at 112. Dr. Fink noted that although the school reported that A.S. behaved well and paid more attention than most of her peers, at home she was inattentive and noncompliant with chores and homework completion.  Hearing Decision at 4, ¶ 4; Record, Vol. I at 114.  Dr. Fink observed that A.S.'s behavior varied "quite significantly" between home and school, noting that she "apparently maintains her behavior quite well at school[.]"  Record, Vol. I at 114.  Dr. Fink did not conclude that A.S. had any disabilities, but gave her strategies for addressing her problems.  Hearing Decision at 4, ¶ 4; Record, Vol. I at 114-15.  Dr. Fink did note a "pattern of very subtle difficulties with motor regulation, visual-motor planning, and initial inflexibility with novel tasks of problem solving," suggesting "the possible presence of very mild frontal lobe inefficiency."  Record, Vol. I at 114.

7.     During sixth grade, the Parents provided A.S. with private psychological counseling to address homework and organizational issues.  *Id*., Vol. III at 648 (C.G. testimony).  A.S. had great difficulty completing homework throughout middle school.  *Id*. at 646-51 (C.G. testimony).

8.     In seventh grade, A.S.'s grades were a rather even mix of As, Bs and Cs.  Hearing Decision at 4, ¶ 5; Record, Vol. I at 124.  There were issues with missing assignments, but her

behavior was consistently good in all areas, according to her report card. *Id*. The following year, in eighth grade, A.S.'s grades began to decline. Hearing Decision at 4, ¶ 6; Record, Vol. I at 123. A.S. continued to get mostly Bs and Cs, with an occasional A or D. *Id*. During the second quarter of eighth grade she failed science as a result of non-completion of projects and homework. *Id*. Some of her teachers noted that she needed to try harder and that she did not turn in assignments. *Id*.; *see also* Record, Vol. III at 649 (C.G. testimony). At about the same time she began socializing with a new group of friends, and her attitude toward school declined. Hearing Decision at 4, ¶ 6; Record, Vol. III at 649 (C.G. testimony). She dropped out of band, began to wear inappropriate clothing and spoke of hating school. Record, Vol. III at 649-50 (C.G. testimony).

9. During A.S.'s eighth-grade year her parents grew markedly more concerned about her declining performance. *Id*. Concerned about A.S.'s ability to succeed in high school, the Parents asked MSAD #28 to retain her in eighth grade for another year or to provide tutoring services, but the school district denied their requests. Hearing Decision at 4, ¶ 7; Record, Vol. II at 356. During the summer of 2003 C.G. noticed scratch marks on A.S.'s forearms. Record, Vol. III at 650 (C.G. testimony). A.S. balked at performing her summer job as a camp counselor and began to fly into rages when interacting with her parents. *Id*. at 650-51 (C.G. testimony).

10. In the fall of 2003 A.S. began attending Camden Hills Regional High School ("CHRHS"), which is operated by the District. Hearing Decision at 5, ¶ 8; Record, Vol. I at 120. About two weeks after the start of the school year, A.S. stopped doing homework. Record, Vol. III at 651 (C.G. testimony). C.G. phoned CHRHS's freshmen counselor, Cindy Vohringer, to request tutoring, describing A.S. to Vohringer as an "at risk" student. *Id*.; *see also id.*, Vol. IV at 865 (testimony of Cynthia Ann Vohringer). While C.G. informed Vohringer of A.S.'s academic difficulties in eighth grade, she primarily discussed the Parents' concerns about issues at home, such as the

student's choice of friends and the appropriate level of supervision at home.  Hearing Decision at 5, ¶ 8; Record, Vol. IV at 866 (Vohringer testimony).  Vohringer denied the request for tutoring on the ground that it was as yet too early; the Parents would have to wait and see how things went.  Record, Vol. III at 651 (C.G. testimony).  Vohringer lacked state certification as a school counselor during the 2003-04 school year.  Record, Vol. IV at 872 (Vohringer testimony).  She had a caseload of 200 students.  *Id*. at 876 (Vohringer testimony).

11.     In an effort to stay abreast of A.S.'s progress and assignments, the Parents regularly corresponded with A.S.'s teachers by e-mail.  Hearing Decision at 5, ¶ 8; Record, Vol. II at 400-15, Vol. III at 651-52 (C.G. testimony).  In October 2003 the Parents, concerned that A.S.'s grades already were starting to plummet and her behavior was worsening at home, requested a face-to-face meeting with Vohringer.  Record, Vol. III at 652 (C.G. testimony).  They again requested tutoring, but Vohringer said that in her opinion A.S. needed help with organizational skills instead.  *Id*.  Vohringer offered to try to work with A.S. on those skills, but to C.G.'s knowledge no such help was ever provided.  *Id*.  During the course of that meeting, the Parents disclosed to Vohringer the fact that A.S. had been sexually abused as a preschooler.  Hearing Decision at 5, ¶ 9; Record, Vol. III at 653 (C.G. testimony).  C.G. explained that A.S. had had counseling for this.  *Id*.  Vohringer treated this information as confidential and did not share it with other school personnel.  Hearing Decision at 5, ¶ 9; Record, Vol. IV at 876 (Vohringer testimony).  Following the meeting, Vohringer spoke with A.S.'s teachers.  Hearing Decision at 5, ¶ 9; Record, Vol. IV at 867 (Vohringer testimony).  They reported that A.S.'s focus at school was social, rather than academic, and that homework completion was sometimes a problem.  *Id*.  None of the teachers expressed concern to Vohringer about emotional issues.  Record, Vol. IV at 867 (Vohringer testimony).

12. At home, A.S. became increasingly oppositional and angry. Hearing Decision at 5, ¶ 10; Record, Vol. III at 652-53 (C.G. testimony). Her mother found evidence that she had begun smoking cigarettes and marijuana and drinking alcohol. *Id*. A.S. abruptly quit the swim team, which had been a long-term interest of hers, after just one workout. *Id*. Record, Vol. III at 646-47, 652 (C.G. testimony).

13. Periodically, Vohringer checked in with A.S. Hearing Decision at 6, ¶ 11; Record, Vol. IV at 867, 869 (Vohringer testimony). In November, Vohringer administered the Myers-Briggs personality test to the entire freshman class. Hearing Decision at 6, ¶ 11; Record, Vol. IV at 867 (Vohringer testimony). A.S. was very engaged in it, and was a spokesperson of her group. Hearing *Id*.

14. A.S.'s first suicide attempt (ingesting a half bottle of ibuprofen) occurred in November 2003, although the Parents did not learn of it until after they made a unilateral placement at Moonridge Academy in March 2004. Record, Vol. III at 652, 662 (C.G. testimony). Her first-quarter grades were English, C-, Global Science, C-, Health, D, Integrated Math, F, Latin, D-, Physical Education, C, and World History, C. *Id*., Vol. I at 120. A.S. was absent from school once during the first quarter. *Id*.

15. On December, 3, 2003 C.G. sent an e-mail to Vohringer thanking her for her help and support. Hearing Decision at 6, ¶ 12; Record, Vol. II at 399. She also stated, "Last night [A.S.] became very difficult to deal with and said quite strongly that she will quit school when she turns 16 and there is nothing anyone can do about it. She has no intentions of completing her homework assignments or studying for tests, quizzes, etc." *Id*. C.G. relayed A.S.'s anger at not being permitted to hang out downtown with her friends, some of whom had juvenile criminal records. *Id*. She also advised Vohringer that A.S. was about to begin private counseling "because we are very concerned

that [A.S.] is slipping away." *Id*.  C.G. closed with, "Just wanted you to know." *Id*.  Vohringer saw this as a positive step for A.S. and her parents but not one that directly affected A.S. at school. Record, Vol. IV at 868 (Vohringer testimony).  Two-and-a-half hours after receiving C.G.'s e-mail she responded, mentioning the Myers-Briggs personality profile and adding, "[I] t helps me understand why she isn't finding a lot of success right now – creative types typically don't have the same good 'fit' in public schools as the strongly academic students enjoy."  Hearing Decision at 6, ¶ 12; Record, Vol. II at 397, 399.

16.     A.S. began counseling with Linda Vaughan, Ph.D., on December 5.  Hearing Decision at 6, ¶ 13; Record, Vol. I at 198.  A.S. presented as an agitated, depressed, risk-taking adolescent. *Id.* She also had symptoms of post-traumatic stress disorder ("PTSD"), including difficulty sleeping, outbursts of anger, difficulty concentrating, poor school performance and significant disruption to the family as a result of her behavior. *Id*.

17.     Teachers continued to keep in touch with the Parents about A.S.'s school work. Hearing Decision at 6, ¶ 14; Record, Vol. II at 392-96.  Sometimes A.S. was doing well; at other times, she was not engaged in her work. *Id*.  Her teachers thought she seemed like a typical freshman. Hearing Decision at 6-7, ¶ 14; Record, Vol. IV at 857-59 (testimony of Elizabeth Anderson Dailey), 863 (testimony of Robert Arthur Lovell).  She was outgoing and engaged with her friends and did not always complete her assignments, which was not unusual for a freshman. *Id*.

18.     On December 19, 2003 Robert Lovell, A.S.'s science teacher, announced that a former student of his would be a guest speaker in class on Monday, December 22.  Hearing Decision at 7, ¶ 15; Record, Vol. IV at 863-64 (Lovell testimony).  Lovell was unaware that the guest speaker had sexually abused A.S. more than ten years earlier. *Id*.  When A.S. learned that her childhood perpetrator was to be a guest speaker in her class, she became hysterical and called her father.

Hearing Decision at 7, ¶ 15; Record, Vol. III at 654 (C.G. testimony), Vol. IV at 789-90 (testimony of B.S.). At that time she was crying uncontrollably. Record, Vol. I at 177. B.S. advised her to speak with Vohringer; however, Vohringer was not available, so A.S. went to see the school nurse, Judy Clossey. Hearing Decision at 7, ¶ 15; Record, Vol. III at 654 (C.G. testimony), Vol. IV at 789-90 (B.S. testimony). A.S. did not present to Clossey as overly distressed. Hearing Decision at 7, ¶ 15; Record, Vol. I at 137. A.S. also called her mother, who was in Washington, D.C., on business. Hearing Decision at 7, ¶ 15; Record, Vol. III at 654 (C.G. testimony). C.G. spoke with assistant principal Don Palmer, who assured her that he would not allow the guest speaker in the class. *Id.* Palmer then told Lovell that the guest speaker was not allowed in class. Hearing Decision at 7, ¶ 15; Record, Vol. IV at 864 (Lovell testimony). The individual never attended A.S.'s class. Record, Vol. IV at 864 (Lovell testimony). A.S.'s teachers did not observe her to be in distress, either at the time the incident occurred or after Christmas break. Hearing Decision at 7, ¶ 15; Record, Vol. IV at 859-60 (Dailey testimony), 864 (Lovell testimony). On Monday, December 22 Vohringer spoke to A.S., who appeared to be in good spirits. Hearing Decision at 7, ¶ 15; Record, Vol. IV at 869 (Vohringer testimony). This brief conversation transpired when Vohringer sought A.S. out in the hall between classes. Record, Vol. IV at 874 (Vohringer testimony).

19.     After December 19, 2003 A.S. became oppositional and violent, breaking doors and kicking in walls at home. Record, Vol. III at 655-56 (C.G. testimony). During this time, she was threatening to kill herself, prompting her parents to hide or secure all the knives, medication and alcohol in the house. *Id.* Once, A.S. even attacked her mother with a barbecue skewer. *Id.* at 656 (C.G. testimony). After December 19, the Parents brought A.S. in to see her pediatrician, Susan McKinley, M.D., who diagnosed her with PTSD, depression and anxiety and prescribed Prozac for her. *Id.*, Vol. I at 104, Vol. III at 655 (C.G. testimony). The Parents learned in January, after receiving

their cell-phone bill, that A.S. had called a suicide hotline the day after the December 19 announcement and on a second occasion shortly thereafter. *Id*. at 655 (C.G. testimony).

20.     A.S. next saw Dr. Vaughan on January 4, 2004. Hearing Decision at 7, ¶ 16; Record, Vol. I at 198. A.S.'s behavior problems had increased significantly. *Id*. Dr. Vaughan tentatively diagnosed her with PTSD, oppositional defiance disorder ("ODD"), major depressive disorder and rule-out attention deficit hyperactivity disorder ("ADHD") or other learning disorder. Record, Vol. I at 199. Dr. Vaughan advised the Parents that A.S. needed residential therapeutic treatment at a center that specialized in teenagers with similar issues, inasmuch as "[i]t was quite apparent that her parents and her family were not in a position to man[a]ge her behavior and mental health issues[,] and [Dr. Vaughan] did not feel that she could be treated on an outpatient basis." Hearing Decision at 7-8, ¶ 16; Record, Vol. I at 198-99. In addition, A.S.'s pediatrician, Dr. McKinley, recommended that A.S.'s parents not leave her alone. Record, Vol. III at 660 (C.G. testimony).

21.     By January 2004 A.S. was routinely refusing to attend school and often would not even get out of bed. Hearing Decision at 8, ¶ 17; Record, Vol. III at 656 (C.G. testimony). Her parents had to physically drag her to the high school on the days she attended that month. Record, Vol. III at 656 (C.G. testimony). Once at the school, A.S. acted normal, and her teachers did not see her behavior as an issue. Hearing Decision at 8, ¶ 17; Record, Vol. IV at 859-60 (Dailey testimony), 863-64 (Lovell testimony). A.S. continued to have problems with homework completion, however. Hearing Decision at 8, ¶ 17; Record, Vol. IV at 859 (Dailey testimony). A.S.'s history teacher began to reduce and otherwise modify academic expectations for A.S. during January 2004 without informing the Parents of the change. Record, Vol. IV at 861-62 (Dailey testimony), 887 (C.G. testimony). A.S. nonetheless still received a failing grade in history. *Id*., Vol. I at 120.

22.      About the third week of January C.G. called Vohringer to notify her of A.S.'s increasingly oppositional behavior and refusal to attend school. Hearing Decision at 8, ¶ 18; Record, Vol. III at 656-57 (C.G. testimony). Vohringer offered to have A.S.'s teachers call her to attempt to coax her back to school. Hearing Decision at 8, ¶ 18; Record, Vol. III at 657 (C.G. testimony). Although Vohringer contacted some of the teachers, none called A.S. *Id.*; *see also* Record, Vol. IV at 869 (Vohringer testimony). During the conversation with Vohringer in January, the Parents informed her of the diagnoses obtained from A.S.'s counselor and physician. Record, Vol. III at 656-57 (C.G. testimony). As of this point, no one from the District had made any mention to the Parents about special-education rights or the potential availability of services under section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 701 *et seq*., and the Parents were not otherwise aware of those rights or services. *Id*. at 657 (C.G. testimony).[4]

23.      A.S.'s school attendance was good until the end of the semester. Hearing Decision at 8, ¶ 19; Record, Vol. I at 120. She finished the semester with very poor grades, failing math and history and withdrawing from Latin. *Id*. After completing her mid-year exams, A.S. categorically refused to go to school any longer. Hearing Decision at 8, ¶ 19; Record, Vol. III at 656 (C.G. testimony). Fearing for their safety, the Parents stopped physically forcing her to attend school. Record, Vol. III at 658 (C.G. testimony). Thereafter, A.S. attended school for only two or three days within a two-week period. Hearing Decision at 8, ¶ 19; Record, Vol. I at 79, Vol. III at 658 (C.G. testimony). She ceased attending school altogether as of February 9. Record, Vol. I at 79. Although C.G. called the school each day to report A.S.'s absence, no one asked for a reason. Hearing Decision at 8, ¶ 19; Record, Vol. III at 658 (C.G. testimony).

---

[4] The Parents assert that, during this conversation, Vohringer allowed for the first time that perhaps A.S. might be a "504 student." *See* Parents' Brief at 8, ¶ 29. However, C.G. testified that the Parents had the "504" conversation with Vohringer after the conversation in which they disclosed A.S.'s diagnoses. *See* Record, Vol. III at 657 (C.G. testimony).

24.     On January 30, 2004 the Thomaston police called the Parents to pick up A.S., who was reportedly drunk.  Hearing Decision at 8, ¶ 20; Record, Vol. III at 658 (C.G. testimony).  The Parents took her to the emergency room at Pen Bay Medical Center.  *Id*.  A.S. said she had taken her father's Adderall.  *Id*.  She tested positive for alcohol and amphetamines but became stable after about ninety minutes, whereupon she was discharged home.  *Id*.; *see also* Record, Vol. II at 386.

25.     During January 2004 the Parents contacted numerous organizations trying to find help for A.S.  Record, Vol. III at 657 (C.G. testimony).  They first learned about the "PET" process in discussions with staff at Midcoast Mental Health Center, but even then they did not know that the acronym signified "Pupil Evaluation Team."  *Id*. at 657-58 (C.G. testimony).  At the end of January, after A.S. had missed a few consecutive days of school, B.S. called Vohringer, who suggested that A.S. might be eligible for help under Section 504.  Hearing Decision at 8, ¶ 21; Record, Vol. III at 657 (C.G. testimony), Vol. IV at 869-70 (Vohringer testimony).  Vohringer offered to schedule a Section 504 meeting, and set one up for February 6, 2004.  Hearing Decision at 9, ¶ 21; Record, Vol. IV at 869-70 (Vohringer testimony).  The meeting was to include A.S.'s teachers.  Record, Vol. IV at 870 (Vohringer testimony).[5]

---

[5] The Parents propose that the court find that when B.S. phoned Vohringer on or about February 1, 2004, he expressly asked her to schedule a "PET" meeting, which she did for February 6.  *See* Parents' Brief at 9, ¶ 34.  They assert that one of A.S.'s teachers (Dailey) confirmed that she was invited to a "PET meeting" on February 6.  *See id*.  Dailey testified merely that she was invited to an official meeting on February 6; she could not clearly remember its title (whether "special ed" and/or "504").  Record, Vol. IV at 862-63 (Dailey testimony).  B.S. did indeed insist at hearing that he had expressly asked Vohringer to schedule a "PET" meeting; however, she testified, to the contrary, that when B.S. contacted her she suggested holding a Section 504 meeting, which was the only meeting she was authorized to schedule.  *Compare id*. at 790 (B.S. testimony) *with id*. at 869-70, 874 (Vohringer testimony).  C.G. testified that she recalled overhearing Vohringer on speakerphone telling B.S. that A.S. could be a 504 student, a status that might provide assistance such as extra time for homework, although C.G. testified that B.S. later called Vohringer to request that she schedule a "PET."  *Id*., Vol. III at 657-58 (C.G. testimony).  The Hearing Officer carefully considered this factual conflict, resolving it in favor of the District inasmuch as the District's witnesses (Vohringer and Special Education Director Cynthia Foreman) were very clear that only Foreman had authority to schedule a PET, while the Record disclosed contemporaneous confusion on the Parents' part about special education that might account for their different recollection of what happened.  Hearing Decision at 24; *see also, e.g*., Record, Vol. I at 106-08, 125, 129, Vol. IV at 803 (testimony of Cynthia Jean Foreman), 870 (Vohringer testimony).  The Hearing Officer's resolution of this dispute is entirely reasonable and is supported by a preponderance of the Record evidence.  Accordingly, I do not disturb it.

26.     On or about February 3 C.G. called Foreman to ask for an explanation of the "PET" acronym.  *Id*., Vol. III at 659 (C.G. testimony).[6]  Foreman explained the referral, testing and eligibility process.  Hearing Decision at 9, ¶ 22; Record, Vol. IV at 802 (Foreman testimony).  C.G. inquired about having the District support a residential placement for A.S.  *Id*.  There was no discussion about A.S.'s PTSD diagnosis or sexual abuse.  Hearing Decision at 9, ¶ 22; Record, Vol. IV at 816 (Foreman testimony).  C.G. ended the phone call abruptly, saying "she believed her daughter was very defiant, but not special education[.]"  Record, Vol. IV at 802 (Foreman testimony).  The Parents canceled the February 6 meeting.  Hearing Decision at 9, ¶ 21; Record, Vol. III at 659 (C.G. testimony).[7]

27.     On the next day, February 4, 2004, the Parents received A.S.'s first-semester grades: Freshman English, D+, Global Science, D+, Health, D, Integrated Math, F, Latin, W/F, Physical Education, C-, and World History, F.  Record, Vol. I at 120.  The Parents located an educational consultant and a lawyer to advise them.  *Id*., Vol. III at 659.  As of February 13, A.S. had missed a

---

[6] The Hearing Officer found that C.G. called Foreman to schedule a PET meeting.  *See* Hearing Decision at 9, ¶ 22.  The Parents challenge that finding, asserting that C.G. called to ask for an explanation of the acronym after her husband had already scheduled a PET meeting,  *See* Parents' Brief at 9, ¶ 35.  Inasmuch as C.G. evidently thought (mistakenly) that a PET meeting already had been scheduled for February 6, I do not find it plausible that she called to schedule such a meeting.

[7] The Parents urge the court to find that, during the February 3 conversation, Foreman sternly told C.G. that the family should not expect to have the District pay for a private placement for A.S.  *See* Parents' Brief at 9, ¶ 35.  C.G. testified that Foreman issued such a stern warning, advising her that "a PET was for kids with special needs such as blind children, deaf children, children in wheelchairs."  Record, Vol. III at 659 (C.G. testimony).  By contrast, Foreman, who had been in the special-education field for thirty-three years, including nearly nineteen years as a full-time special-education director, testified that she received a call from a very distressed C.G. in which C.G. relayed that Midcoast Mental Health had advised her that if she requested a PET, the PET would support a residential placement.  *Id*., Vol. IV at 802 (Foreman testimony).  Foreman testified that she told C.G. that was not exactly how it worked and then launched into the "process conversation" she has had countless times over the years with parents, discussing referrals, PET meetings, the identification process and so forth.  *Id*.  Foreman denied ever having told C.G. that the District would not place residential students unless they were blind or in wheelchairs, asserting that would have been a "ridiculous" thing for her to say.  *Id*. at 816.  The Hearing Officer resolved this conflict in favor of the District, observing: "It is not credible that a special education director with Ms. Foreman's experience would tell parents, particularly sophisticated, educated professionals like the parents here, that special education was only for students who were blind, deaf or in wheelchairs.  It is possible that, in explaining the process, Ms. Foreman gave examples such as those, but it is difficult to believe that if she were giving such information as the parents alleged, she would have remained in her position for long.  Additionally, all written documentation of what transpired demonstrates that Ms. Foreman was professional, cooperative and responsive to the parents' referral to special education."  Hearing Decision at 24.  I discern no basis on which to disturb this thoughtful and supportable resolution of the conflict.

total of ten days of school since her attendance first became inconsistent on January 27.  *Id*., Vol. I at 79.

28.   On or about Friday, February 13 B.S. sent an e-mail to Foreman.  Hearing Decision at 9, ¶ 23; Record, Vol. II at 385.  In it, he explained that he had contacted Vohringer to "reschedule the PET that was scheduled for 02/06/04."  *Id*.  He expressed some confusion about whom to contact regarding PET meetings.  *Id*.  Vohringer had no authority to schedule PET meetings, as this was done exclusively by the special-education office.  Hearing Decision at 9, ¶ 23; Record, Vol. IV at 803 (Foreman testimony), 870 (Vohringer testimony).   Section 504 meetings, however, were the responsibility of the director of counseling, who was Vohringer's supervisor.  Hearing Decision at 9, ¶ 23; Record, Vol. I at 129, Vol. IV at 871-72 (Vohringer testimony).  B.S. asked to schedule a PET meeting as soon as possible.  Hearing Decision at 9, ¶ 23; Record, Vol. II at 385.  School vacation began the following day.  Hearing Decision at 9, ¶ 23; Record,  Vol. IV at 802-03 (Foreman testimony).  Foreman replied to B.S.'s e-mail on February 17, stating that from a conversation she had with C.G., she  was under the impression the Parents had decided not to pursue special education because they felt A.S. would not be eligible.  Hearing Decision at 9, ¶ 23; Record, Vol. I at 108.  However, she added, "I'd be very happy to schedule a PET," and scheduled one for the next school day, Monday, February 23, 2004.  Hearing Decision at 9-10, ¶ 23; Record, Vol. I at 107-08.  B.S. responded that C.G. had spoken to Foreman and that it was clear from the conversation that Foreman did not think A.S. would be eligible for special education.  Hearing Decision at 10, ¶ 23; Record, Vol. I at 107.  Foreman demurred, stating that this was not how she recalled the conversation.  *Id*.  Her recollection was that she explained the process and eligibility to C.G., who

> kept saying that your daughter is defiant and not special ed.  I tried to exploain [sic] that defiance alone does not qualify any student as special ed.  The handicapping conditions I was referring to were emotionally disabled or learning disability.  I do not

have the right to say your daughter does not qualify for special ed.  That question has to
be answered through evaluation and the PET process.

*Id*.  B.S. then explained that the family had other commitments on February 23 and requested March 1

for the PET meeting.  *Id*.  Because that date was not good for the District, the PET was scheduled for

March 3.  Hearing Decision at 10, ¶ 23; Record, Vol. I at 106-07.  B.S. confirmed the date, apprising

Foreman that A.S. was "clearly an at risk student."  Hearing Decision at 10, ¶ 23; Record, Vol. I at

106.

29.     On March 3, 2004 the Parents attended the PET meeting with attorney Rita Furlow.

Hearing Decision at 10, ¶ 24; Record, Vol. I at 86.  They shared their concerns about A.S.'s school

performance and emotional health.  *Id*.  They provided a statement of concerns that made clear they

"currently [were] in a crisis situation with [A.S.]."  Record, Vol. I at 90.  They relayed that upon

reviewing A.S.'s cell-phone bill, they had learned that she had called a suicide hotline on December

20, 2003.  Hearing Decision at 10, ¶ 24; Record, Vol. II at 362.  C.G. advised the PET that after the

December 19 incident at school, A.S.'s "behavior went from a slow decline to completely vertical.

She became violent, extremely depressed, angry, anxious."  Record, Vol. II at 363.  C.G. also

expressed her surprise that, after the December 19 incident, no one from the school had called to

assure the Parents that A.S. would be safe from the perpetrator of her abuse, who had a history of

stalking A.S. and whose sister attended CHRHS.  *Id*. at 364.  The Parents brought with them to the

PET the two psychological evaluations they had had done when A.S. was in fourth and sixth grades

(those by Drs. Dodge and Fink) and two brief letters: one dated March 1, 2004 from Dr. Vaughan

stating that A.S. had diagnoses of dysthymia, PTSD and ODD and that these disorders had

"significantly impacted her ability to perform academically and [had] contributed to her multiple

absences from school[,]" and one dated March 1, 2004 from Dr. McKinley stating that A.S. was

suffering from PTSD, depression and anxiety, was currently on Prozac, and her "mental state [was]

tenuous due to the recent events which would have put her in contact with the perpetrator of her past abuse."  Hearing Decision at 10-11, ¶ 24; Record, Vol. I at 104-05, Vol. IV at 803-04 (Foreman testimony).  Neither the McKinley nor the Vaughan letter offered educational recommendations. Record, Vol. I at 104-05.  None of the documents presented by the family at the PET meeting had been provided to the District prior to the meeting.  *Id.*, Vol. IV at 803 (Foreman testimony).

30.     At the meeting, A.S.'s two teachers in attendance (and a third who wrote a letter that was read aloud) discussed her failure to pass in homework, but none had observations that she might have a disability requiring special education.  Hearing Decision at 11, ¶ 24; Record, Vol. II at 368-69, Vol. IV at 803 (Foreman testimony).[8]  Rose Mary Fetterman, the school psychological services provider, observed that A.S. did not appear to have a learning disability.  Hearing Decision at 11, ¶ 24; Record, Vol. II at 369.  The Parents' attorney, Furlow, suggested that the PET had enough information before it to identify A.S. as a student with an emotional disability.  Hearing Decision at 11, ¶ 24; Record, Vol. II at 370-71.  Fetterman disagreed, stating that she was "uncomfortable about trying to make an eligibility determination today.  I think we need to go in that direction, by gathering some more things, talking to the people, really look at what the school's responsibility is. . . . I don't want to come across as you feeling like I'm not listening.  I just want to slow it down and see what there is out there and see what the school has to complement.  That's all.  And I am concerned about doing something as quickly as we can."  Record, Vol. II at 371-72.  Foreman offered tutoring for A.S. pending a decision on eligibility.  *Id.* at 372.  The Parents took a break from the meeting, conferred with their attorney, returned to the meeting and stated that they rejected tutoring, which they did not believe would be successful.  *Id.*  They announced that, in view of their concern about their daughter's mental and physical well-being and safety within the school, both from her perpetrator and some of her

---

[8] The Hearing Officer stated that three of A.S.'s teachers were in attendance; however, the Record indicates that two attended and (*continued on next page*)

peers, they were going to make a unilateral private placement and seek reimbursement. *Id*. at 372-73. Foreman confirmed with the Parents that they wanted to continue to pursue special-education eligibility despite their decision to remove A.S. from the District's schools and place her privately. Hearing Decision at 11, ¶ 24; Record, Vol. II at 375.  She offered to pursue a superintendent's agreement to permit A.S. to attend a different public high school than CHRHS; however, the Parents did not express interest in pursuing that option.  Record, Vol. II at 373-74. Foreman said that she thought it was important, inasmuch as the PET was eyeing identification based on emotional disability, to speak with both Drs. McKinley and Vaughan.  *Id*. at 375.  Fetterman stated that the District would want to do its own testing, including academic achievement testing, possibly additional psychological testing depending on what had already been done, and solicitation of feedback from A.S.'s teachers in lieu of classroom observation, which was not possible.  *Id*.  She again disputed that the District had sufficient information to identify A.S. as a student with an emotional disability, commenting that the Fink and Dodge reports were dated and that the diagnoses of Drs. Vaughan and McKinley, standing alone, were insufficient.  *Id*. at 376.  The Parents provided written consent for the District to contact Drs. Vaughan and McKinley, as well as Drs. Dodge and Fink.  *Id*., Vol. I at 85.  Foreman indicated that after contacting Drs. Vaughan and/or McKinley, District personnel would communicate with the Parents by the following Monday to advise them what additional testing they would seek.  *Id*., Vol. I at 88, Vol. II at 375, 377, Vol. III at 660 (C.G. testimony).[9]

  31. No one from the District ever contacted either Dr. Vaughan or Dr. McKinley.  *Id*., Vol. IV at 734 (C.G. testimony).  On March 8, 2004 Foreman met with Fetterman, and the two determined, based on review of the documentation provided by the Parents to the PET, what additional testing was

---

one wrote a letter that was read aloud at the meeting.  *Compare* Hearing Decision at 11, ¶ 24 *with* Record, Vol. II at 368-69.

[9] By letter dated March 3, 2004 – the same day as the PET meeting – the Parents notified the District in writing of their intent to place A.S. unilaterally.  Record, Vol. II at 379.

needed.  Hearing Decision at 11, ¶ 25; Record, Vol. I at 82-84, Vol. IV at 805 (Foreman testimony).

That day, Foreman sent an e-mail and a letter to the Parents explaining the additional information

needed to consider whether A.S. had an emotional disability.  Hearing Decision at 11-12, ¶ 25;

Record, Vol. I at 82-84.[10]  She noted:

> The letters from Drs. McKinley and Vaughan do provide the school with current
> mental health diagnosis' [sic], but do not provide the school with the appropriate
> information to determine eligibility for special education as a student with an
> emotional disability.  You may recall the discussion during the PET and the indication
> that previous evaluations (Dr. Fink and Dr. Dodge) are not current.  You may also
> recall that the PET is a school-based process to consider the effects of current
> behaviors on school performance.  We feel very strongly that we need to conduct our
> own evaluations that are required and the law allows. . . .  The components of the
> school's evaluation will include social emotional scales, input from you and teachers,
> and Attention Deficit Scales to look at your long standing concern[,] and[] current
> cognitive and academic achievement assessments.

Record, Vol. I at 82.  Foreman enclosed a consent form seeking the Parents' permission to conduct

academic testing, intellectual testing, psychological testing and additional assessments, to include

social/emotional and attention scales.  *Id*. at 77-78, 83.  She encouraged the Parents to return the form

as soon as possible.  Hearing Decision at 12, ¶ 25; Record, Vol. I at 83.  She again offered tutoring or

the possibility of sending A.S. to a high school outside the District.  Hearing Decision at 12, ¶ 25;

Record, Vol. I at 82.  She noted that the testing, as well as any tutoring, could be conducted at a neutral

site, such as the community teen center, if that were more appealing to A.S.  Record, Vol. I at 82.  Had

the Parents returned the form quickly, the District would have begun evaluations immediately.  Hearing

Decision at 12, ¶ 25; Record, Vol. IV at 821 (Foreman testimony).

32.    The consent-to-evaluate form arrived at the family's home on March 10.  Record, Vol.

IV at 734 (C.G. testimony).  The Parents were too busy exploring schools and completing applications

---

[10] At hearing, Foreman testified that Fetterman and she did not contact Drs. Vaughan or McKinley because they did not think they
needed to do so for purposes of ascertaining testing for which consent would be sought.  *See* Record, Vol. IV at 819.  Foreman and
Fetterman assumed that, while Drs. Vaughan and McKinley made diagnoses, they would not have performed testing the District was
(*continued on next page*)

to complete and return the form.  Hearing Decision at 12, ¶ 26; Record, Vol. III at 734 (C.G. testimony).  They sent an application to Moonridge Academy ("Moonridge"), a small residential program for teenage girls in Utah that was able to admit A.S. immediately.  Hearing Decision at 12, ¶ 26; Record, Vol. III at 662-63 (testimony of Laura K. Griffiths), Vol. IV at 791 (B.S. testimony).  On the application, B.S. reported that A.S. found school boring and that it was more of a social event. Hearing Decision at 12, ¶ 26; Record, Vol. II at 346.  He indicated that his educational goals for A.S. after her graduation from Moonridge were for her to return to a private or boarding school and graduate from high school.  *Id*.[11]

33.     A.S. was provisionally accepted at Moonridge on March 12, 2004.  Record, Vol. III at 662 (C.G. testimony).  On March 16, 2004 B.S. brought A.S. to Moonridge.  Hearing Decision at 12, ¶ 27; Record, Vol. IV at 791 (B.S. testimony).  After their departure, C.G. faxed the consent-to-evaluate form to Furlow for her review.  Hearing Decision at 13, ¶ 28; Record, Vol. III at 662 (C.G. testimony), Vol. IV at 734 (C.G. testimony).  On March 29 B.S. left a message for Foreman advising her that, after discussions with their attorney, the Parents would sign the form, and that they had placed A.S. at Moonridge in Utah.  Hearing Decision at 13, ¶ 28; Record, Vol. I at 76.  The District received the signed consent-to-evaluate form on March 31, 2004.  *Id*.  Sometime after A.S. was placed at Moonridge, C.G. sent Foreman an e-mail with contact information for Moonridge.  Hearing Decision at 13, ¶ 28; Record, Vol. I at 80, Vol. IV at 806 (Foreman testimony).

34.     On May 20, 2004 Foreman wrote a letter to the Parents observing that it had been a long time since they had had any formal communication.  Hearing Decision at 13, ¶ 29; Record, Vol. I at 75.  Foreman explained that while A.S. was at Moonridge, she was not available for testing by the

---

seeking, such as academic achievement testing.  *See id.*

[11] C.G. testified that as of March 10, 2004 the Parents were "desperately trying to find a place to place [A.S.] for her psychological and emotional and educational well-being. . . . [W]e did not merely put this [the consent form] aside so that Cindy Foreman would not (*continued on next page*)

District's evaluators.  Hearing Decision at 13, ¶ 29; Record, Vol. I at 76.  She said that the District was eager and ready to move forward with the referral process and asked the Parents to let her know when A.S. would be in the area, whereupon she would "make every attempt, even during this summer, to have one of our school psychological service providers available to do the required assessments." *Id*.  She explained that once the testing was completed, she would schedule a PET to review the results.  *Id*.  This was the first time the District had explained to the Parents that unilateral placement of A.S. would or could cause her to be characterized as "unavailable" for testing.  Record, Vol. IV at 820 (Foreman testimony).

35.     About a month later, the Parents wrote Foreman to bring her up to date on A.S.'s status. Hearing Decision at 13, ¶ 30; Record, Vol. I at 66-74.  They took issue with the District's position that A.S. had been unavailable for testing while in Utah, asserting that the District could have sent an evaluator to Utah or found someone in Utah to conduct an evaluation.  Hearing Decision at 13, ¶ 30; Record, Vol. I at 67.  They noted that, by their calculations, the forty-five-day period within which the District was to evaluate A.S. and reconvene the PET had ended on June 9, 2004.  *Id*.  Again, the Parents questioned the District's need to conduct its own evaluations of A.S.  *Id*.  They rejected as unacceptable Foreman's offer to evaluate A.S. when she returned to Maine for her first home visit, which they said they expected would take place in August.  Record, Vol. I at 67.

36.     Foreman responded on July 12, 2004, after she returned from vacation, and inquired about the possibility of evaluating A.S. when she came home in August.  Hearing Decision at 13-14, ¶ 30; Record, Vol. I at 65.  Having received no response, she followed up with an August 5, 2004 e-mail to the Parents inquiring about evaluating A.S. while she was home.  Hearing Decision at 13-14, ¶ 30; Record, Vol. I at 64.  C.G. responded that the family believed the District had evidence that was

get this. . . .  We were very busy trying to get our daughter into a safe place."  Record, Vol. IV at 734.

"more than sufficient" to substantiate A.S.'s qualification for special-education services. Hearing Decision at 14, ¶ 30; Record, Vol. I at 62. Nonetheless, she informed the District that the Parents had made arrangements for an educational and psychological evaluation of A.S. in Utah and would provide the results to Foreman when they were available. Hearing Decision at 14, ¶ 30; Record, Vol. I at 63. She noted that A.S. was expected to make her first home visit from Moonridge in September but likely would not be available for testing. *Id*. This was so, she explained, inasmuch as the purpose of the visit was reintroduction to the family, and A.S.'s itinerary would be extremely limited and would require approval by her therapist. Record, Vol. I at 63.    The District did not hear from the Parents again until they filed a due-process hearing request in June 2005. Hearing Decision at 14, ¶ 31; Record, Vol. IV at 806 (Foreman testimony).

37.    A.S. remained at Moonridge until December 30, 2004. Hearing Decision at 14, ¶ 32; Record, Vol. IV at 738 (C.G. testimony). Moonridge is a very small school licensed for sixteen adolescent girls and staffed with three teachers, several therapists and administrators. Hearing Decision at 14, ¶ 32; Record, Vol. III at 663 (Griffiths testimony).[12] Although most of the teachers there are certified in their respective subject areas, most are not certified in special education. Hearing Decision at 14, ¶ 32; Record, Vol. III at 670 (testimony of Stefanie Trimmer). When A.S. arrived at Moonridge, Darlene Horton, a certified professional counselor there, conducted a mental-health intake assessment. Hearing Decision at 14, ¶ 32; Record, Vol. II at 309-16. She gave A.S. a global assessment of functioning ("GAF") score of 50. Hearing Decision at 14, ¶ 32; Record, Vol. II at 316.[13] A.S. was assigned to a therapist, spent two to three hours each week in individual therapy

---

[12] The Hearing Officer found Moonridge had four teachers; however, Griffiths testified it had three. *Compare* Hearing Decision at 14, ¶ 32 *with* Record, Vol. III at 663.

[13] Horton testified that a GAF score of 50 represents "serious symptoms: Suicidal ideation, severe obsessional rituals . . . frequent shoplifting or any serious impairment in social, occupation[al] or school functioning; unable to keep a job, go to school, that type of thing." Record, Vol. IV at 719.

and had group therapy four to five times a week.  Hearing Decision at 14, ¶ 32; Record, Vol. IV at 718 (testimony of Darlene Horton).  A.S. was given short- and long-term goals to address in therapy relating to her sexual abuse, oppositional defiance, substance abuse and cutting behaviors.  Hearing Decision at 15, ¶ 32; Record, Vol. II at 297-300.  She had two educational goals: (i) to "be able to acknowledge and show an understanding for the importance of education and how it relates to her future" and (ii) to complete assignments and get them turned in on time.  Hearing Decision at 15, ¶ 32; Record, Vol. II at 290, Vol. III at 670 (Trimmer testimony).  A.S. began her stay at Moonridge with serious compliance issues but eventually conformed her behavior as a result of the extremely structured residential program.  Record, Vol. IV at 719, 723 (Horton testimony).  Once she became invested in the therapeutic program at Moonridge, A.S. progressed well in her counseling and made both academic and social gains.  *Id.*, Vol. III at 665 (Griffiths testimony), Vol. IV at 717 (Trimmer testimony), 721 (Horton testimony).  Although her stay was somewhat longer than expected, A.S. successfully completed the seven-level program by December 2004.  *Id.*, Vol. IV at 721-22 (Horton testimony), 736 (C.G. testimony).  While at Moonridge A.S. became more organized and motivated and earned good grades because she received the structure and support she needed.  Hearing Decision at 15, ¶ 32; Record, Vol. I at 224, Vol. II at 281, Vol. IV at 717 (Trimmer testimony).

38.     On April 12, 2004 David H. Stoker, Ph.D., a clinical psychologist, saw A.S. for an intake assessment.  Hearing Decision at 15, ¶ 33; Record, Vol. II at 302.  He noted A.S.'s feelings of anger and opposition and low expectations for herself.  Hearing Decision at 15, ¶ 33; Record, Vol. II at 302-03.[14]  Because she was "experiencing very little emotional discomfort at [that] time," he did not feel that medication was warranted.  Hearing Decision at 15, ¶ 33; Record, Vol. II at 303.  On April

---

[14] Dr. Stoker noted that results of his MMPI-A testing indicated that A.S. "probably has numerous difficulties in school including a general dislike of school, boredom and sleepiness, poor grades and possible truancy, and negative attitudes toward teachers."  Record, Vol. II at 303.  He added: "The test scores suggest that [A.S.] is in the process of giving up on herself."  *Id.*

23, 2004 Dr. Stoker saw A.S. again and conducted several depression inventories, concluding that she was mildly depressed.  Hearing Decision at 15, ¶ 33; Record, Vol. II at 294.  He noted that her depression was not in the clinically significant range upon her admission to Moonridge, and that was consistent with the results of his April 23 test.  *Id*.

39.   On August 12, 2004 Brent Turek, Ed.D., conducted a psychological evaluation of A.S. at the Parents' request.  Hearing Decision at 15, ¶ 34; Record, Vol. II at 273.  Dr. Turek noted that A.S. "tends to be quite conflicted in much of her emotions . . . and a whole range of emotions that appear to be fairly rapid cycling, much like what might be expected if she had Attention Deficit/Hyperactivity Disorder or Bi-polar Disorder."  Hearing Decision at 15, ¶ 34; Record, Vol. II at 276.  He noted that this was somewhat common in girls her age, particularly if they have hormonal issues.  *Id*.  He concluded that A.S. had an average IQ with average achievement for someone her age and no significant problems except ADHD and possibly ODD.  Hearing Decision at 15, ¶ 34;  Record, Vol. II at 278.  He recommended medication for ADHD and accommodations in school for it.  Hearing Decision at 15-16, ¶ 34; Record, Vol. II at 278.  He did not recommend a private placement, but rather stated: "She certainly should be accommodated in the school system due to the ADHD and should be accorded an IEP [individualized education program] to allow her and the teachers to find the best ways to meet her needs and accommodate her difficulties with attention, impulsivity, and difficulty in sitting still and concentrating."  Hearing Decision at 16, ¶ 34; Record, Vol. II at 278.  He gave A.S. a GAF score of 60.  Hearing Decision at 16, ¶ 34; Record, Vol. II at 279.[15]  The Parents did not share Dr. Turek's report with the District.  Hearing Decision at 16, ¶ 34; Record, Vol. IV at 806 (Foreman testimony).

---

[15] A GAF score of 60 represents "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers."  American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) (boldface omitted).

40.     As a general rule, Moonridge permits a second home visit that allows for any needed testing and getting reacquainted with the home environment.  Record, Vol. IV at 721-22 (Horton testimony).  According to the Parents, Moonridge did not feel neuropsychological testing was in A.S.'s best interest, even during her second home visit.  *Id*. at 736, 787 (C.G. testimony), 792 (B.S. testimony).  On A.S.'s second home visit, in November 2004, she and her parents did visit two private schools close to home, Kents Hill School ("Kents Hill") and Hyde School.  *Id*. at 738 (C.G. testimony).

41.     At the time of A.S.'s discharge from Moonridge on December 30, 2004 her GAF score was 70, and she had achieved all of her mental-health and therapy goals.  Hearing Decision at 16, ¶ 35; Record, Vol. I at 226-35.[16]  During the entire time that A.S. was in Utah, the District never communicated with Moonridge or sought any information about A.S.'s placement or progress, although authorized to do so by the Parents.  Record, Vol. IV at 736, 738 (C.G. testimony).

42.     Before A.S.'s discharge the Parents arranged for her to attend Kents Hill.  Hearing Decision at 16, ¶ 36; Record, Vol. IV at 736 (C.G. testimony).  Although A.S. did well socially there, she did poorly academically because Kents Hill did not offer adequate structure and supervision.  Hearing Decision at 16, ¶ 36; Record, Vol. II at 438-44, Vol. IV at 739-41 (C.G. testimony).  A.S. did not receive special-education services there.  Hearing Decision at 16, ¶ 36; Record, Vol. IV at 807 (Foreman testimony).  The Parents removed A.S. from Kents Hill in early April 2005.  Hearing Decision at 16, ¶ 36; Record, Vol. IV at 740 (C.G. testimony).  They did so in the wake of disciplinary issues arising from A.S.'s failure to attend classes because she was unable to get out of bed.  Record, Vol. II at 438-39, Vol. IV at 739-40 (C.G. testimony).[17]  The Parents never notified the District of

---

[16] Horton testified that a GAF score of 70 reflects "[s]ome mild symptoms.  Some difficulty in social or school functioning, but generally functioning pretty well; has some meaningful interpersonal relationships."  Record, Vol. IV at 722.

[17] In a psychiatric evaluation of A.S. dated April 14, 2005, Julie Balaban, M.D., noted that over time, A.S. began having difficulty (*continued on next page*)

24

A.S.'s discharge from Moonridge or entrance to or withdrawal from Kents Hill.  Hearing Decision at 16, ¶ 36; Record, Vol. IV at 806-07 (Foreman testimony).  The Parents believed, as of August 2004, that the District had "washed [its] hands" of them and A.S.  Record, Vol. IV at 781 (C.G. testimony).

43.    The Parents incurred expenses for A.S.'s placement at Moonridge from March 18, 2004 through her program graduation on December 30, 2004 of $72,370 for tuition and $9,995.30 for transportation and related costs.  Record, Vol. II at 445-48.

44.    At the Parents' request, Laura Slap-Shelton, Psy.D., conducted an evaluation of A.S. on four days between May 19, 2005 and July 29, 2005.  Hearing Decision at 16, ¶ 37; Record, Vol. I at 170, Vol. IV at 740 (C.G. testimony).[18]  She obtained behavior ratings from the Parents and reviewed records from Moonridge and Kents Hill but did not speak with anyone there or obtain behavior ratings from teachers because A.S. was not in school.  Hearing Decision at 16, ¶ 37; Record, Vol. I at 170-71, Vol. IV at 710-11 (testimony of Laura Slap-Shelton, Psy.D.).  She diagnosed A.S. as having bipolar disorder and PTSD, and thought that A.S.'s earlier sexual abuse precipitated the decline in her mental health.  Hearing Decision at 16-17, ¶ 37; Record, Vol. IV at 702-03 (Slap-Shelton testimony).  In addition, she assessed A.S. as suffering from ADHD, mild cognitive dysfunction and mild learning difficulties.  Record, Vol. I at 187.  She considered A.S. to have clinically significant levels of depression, acting-out behaviors, rebelliousness and potential for drug and alcohol abuse, as well as significant symptoms of inattention, hyperactivity, impulsivity and mood lability.  Hearing Decision at

---

getting to class at Kents Hill.  Record, Vol. I at 213.  "Teachers there would note similar problems to previously, where some days [A.S.] was totally with it and enthusiastic, and then other days she was so far down that they would 'wonder if she was still breathing.'  She would have times when she just could not get out of bed."  *Id.*

[18] The Hearing Decision states that testing commenced on May 19, 2004; however, this clearly is a typographical error.  *Compare* Hearing Decision at 16, ¶ 37 *with* Record, Vol. I at 170.

17, ¶ 27; Record, Vol. I at 186.[19]  In her opinion, A.S. regressed after leaving Moonridge and, without appropriate supports, was at risk for alcohol and substance abuse, suicidal activities and school failure.  Hearing Decision at 17, ¶ 27; Record, Vol. I at 187.  To avoid further relapse, Dr. Slap-Shelton recommended a structured residential educational and therapeutic placement.  *Id*.  She felt that A.S. needed a highly structured setting with trained staff and small classes to be successful in school. Hearing Decision at 17, ¶ 27; Record, Vol. I at 188.  She  made seven clinical and eighteen academic recommendations for A.S.  Hearing Decision at 17, ¶ 27; Record, Vol. I at 187-89.

45.     At the end of June 2005 A.S. began seeing Jennifer Miller, M.D., a psychiatrist specializing in adolescents, for therapy and psychopharmacology.  Hearing Decision at 17, ¶ 38; Record, Vol. IV at 726 (testimony of Jennifer Ann Miller, M.D.).  Dr. Miller started seeing A.S. twice weekly to avoid the need for inpatient hospitalization.  Hearing Decision at 17, ¶ 38; Record, Vol. IV at 727 (Miller testimony).  She diagnosed A.S. with bipolar disorder.  *Id*.

46.     Upon reviewing documents for the due-process hearing, Foreman learned that the Parents had had A.S. evaluated by Dr. Slap-Shelton in May 2005.  Hearing Decision at 17, ¶ 39; Record, Vol. I at 130.  Foreman sent a letter to the Parents reminding them that the District had been seeking to evaluate A.S. for some time.  *Id*.  She asked the Parents whether they wanted to schedule a PET meeting to review Dr. Slap-Shelton's evaluation and make a determination regarding special-education eligibility.  *Id*.  The Parents agreed.  Record, Vol. IV at 742 (C.G. testimony).  Prior to the initial PET meeting, the Parents shared with the District the Slap-Shelton neuropsychological evaluation report.  *Id*.[20]

---

[19] Dr. Slap-Shelton described A.S. as presenting "a very complex diagnostic picture" given not only her bipolar disorder but also her continued demonstration of signs of ADHD and PTSD as well as brain weaknesses in her functioning, including some frontal lobe weakness, fine-motor weakness and verbal memory difficulties.  Record, Vol. IV at 703.

[20] The District requested a continuance of the due-process hearing to permit the new PET process to move forward.  Record, Vol. I at 44-45.  The Parents did not object to the continuance, which the Hearing Officer granted.  *Id*. at 46-53.

47.     On September 1, 2005 the PET met.  Hearing Decision at 18, ¶ 40; Record, Vol. II at 434-36.  Drs. Slap-Shelton and Miller participated by telephone.  *Id.*  The PET felt it was not necessary to redo evaluations that had already been done.  Hearing Decision at 18, ¶40; Record, Vol. II at 435.   It was agreed that the District would conduct a language evaluation, as recommended by Dr. Slap-Shelton.  Record, Vol. II at 435-36.  Because the District wanted its own evaluation, the PET agreed to have an outside evaluator chosen by the District review A.S.'s records.  Hearing Decision at 18, ¶ 40; Record, Vol. II at 435-36.   The District asked Frank McCabe, Ed.D., a licensed psychological examiner and certified school psychological services provider, to review existing evaluations and interview teachers and the Parents.  *Id.*; *see also* Record, Vol. IV at 877-78 (testimony of Francis J. McCabe, Jr., Ed.D.).  The Parents agreed to this, but withheld consent for the evaluator's direct involvement with A.S. pending approval of her therapist.  Hearing Decision at 18, ¶ 40; Record, Vol. II at 436-37.  Dr. Miller emphasized that A.S.'s situation was precarious, expressing the opinion that it would be difficult for any school system to provide a program meeting her needs.  Hearing Decision at 40, ¶ 18; Record, Vol. II at 435.  The District's counsel, James Schwellenbach, suggested that this be discussed after the District evaluated A.S.  *Id.*

48.     Because A.S. had been out of school for a long time, Foreman suggested tutoring, which was arranged to help A.S. earn credits in English and history.  Hearing Decision at 18, ¶ 41; Record, Vol. II at 436, Vol. IV at 808 (Foreman testimony).  A.S. began tutoring.  Hearing Decision at 18, ¶ 41; Record, Vol. IV at 808.  Although resistant at first, she was excited about it after the first session.  Hearing Decision at 18, ¶ 41; Record, Vol. IV at 793-94 (B.S. testimony).  Her tutor found her to be present, alert and upbeat, with some comprehension difficulties.  Hearing Decision at 18, ¶ 41; Record, Vol. I at 145.  However, A.S. increasingly refused to participate in tutoring sessions and

refused to do assigned homework.  Record, Vol. IV at 794-95 (B.S. testimony).  Tutorial services eventually ceased in October as a result of A.S.'s refusal to participate further.  *Id.*

49.     Dr. McCabe evaluated A.S. by reviewing prior evaluations, communications from health-care providers and documents from Moonridge and interviewing the Parents, individuals at Camden Rockport Middle School, CHRHS, Moonridge and Kents Hill, Drs. Slap-Shelton and Miller, and A.S.  Hearing Decision at 18, ¶ 42; Record, Vol. I at 131, Vol. IV at 878-79 (McCabe testimony).  In addition, A.S. and her parents completed several rating scales.  Record, Vol. I at 136-37, Vol. IV at 879 (McCabe testimony).  Dr. McCabe did not believe A.S. needed a therapeutic residential placement to progress educationally and thought her needs could be met either in the mainstream classroom or in an alternative or day-treatment placement.  Hearing Decision at 18, ¶ 42; Record, Vol. I at 146.[21]  He has seen the public schools provide appropriate programming for students with even greater needs than those of A.S.  Hearing Decision at 18-19, ¶ 42; Record, Vol. IV at 881 (McCabe testimony).  Dr. McCabe recommended that any program for A.S. have a life-skills component to assist her in coping with and managing her life-stress and mental-health issues and accessing services before she reached crisis stage.  Hearing Decision at 19, ¶ 42; Record, Vol. I at 146.  In the absence of such a component, he noted, "she is grossly at risk for developing further problems that will significantly diminish her chances for adequate post secondary opportunities such as college, vocational, and life adjustment."  Record, Vol. I at 146.  Dr. McCabe also found that A.S. needed (i) a

---

[21] On the subject of placement, Dr. McCabe stated in his October 10, 2005 report: "If [A.S.] is emotionally stable enough to attend the mainstream education setting then she should do that.  It is recommended that to assist the team [to] answer that question beyond these test results, they need to ask, 'what would we and [A.S.] do differently than we did in the past should she return regarding providing consistent structure (e.g., addresses her AD/HD and depressive symptoms) that facilitates work completion, immediate feedback, in order that she feel safe (i.e., develop a safety plan; regular scheduled meeting with the school clinician; resource support; social skills and life skills training; daily check ins; etc.)?' If the answer to that question is beyond the school's scope and resources than an alternative educational placement needs to be pursued (i.e., alternative education or day treatment services)."  Record, Vol. I at 146.  During his subsequent hearing testimony Dr. McCabe stated that he disagreed with Dr. Slap-Shelton's recommendation that A.S. be placed in a therapeutic residential academic setting and that, in his opinion, her needs could be met in public school.  Record, Vol. IV at 881-82.

positive behavioral support plan that was monitored systematically as part of her IEP and (ii) access to support, such as social workers or guidance counselors.  Hearing Decision at 19, ¶ 42; Record, Vol. I at 147; Vol. IV at 886 (McCabe testimony).  He stated in his October 10, 2005 report: "A positive behavioral support plan that is systematically monitored as part of an individual education plan is essential."  Record, Vol. I at 147.  He emphasized keying into A.S.'s assets and developing her interests.  Hearing Decision at 19, ¶ 42; Record, Vol. I at 147.  He recommended that, outside of school, she continue her psychiatric treatment.  *Id*.

50.    The PET met again on October 12, 2005, at which time Dr. McCabe reviewed his evaluation with the team.  Hearing Decision at 19, ¶ 43; Record, Vol. I at 148-49.  Based upon all of the information provided, the PET identified A.S. as a student qualifying for special education because of an emotional disability.  Hearing Decision at 19, ¶ 43; Record, Vol. I at 149.  The PET then worked on developing an IEP for A.S.  Hearing Decision at 19, ¶ 43; Record, Vol. I at 149-50.  PET members discussed goals and objectives for organizational skills, emotional support, academic skills and attendance.  *Id*.  It was noted that A.S. would need a safety/crisis plan and a behavior-support plan but that these would have to be developed with the family and Dr. Miller, so they were not drafted at the meeting.  Hearing Decision at 19, ¶ 43; Record, Vol. I at 150, Vol. IV at 812 (Foreman testimony).[22]  Although the Parents expressed concern about A.S. attending CHRHS, school staff reported that many students with significant psychiatric needs attend CHRHS successfully.  Hearing Decision at 19, ¶ 43; Record, Vol. I at 150.  Foreman also proposed contacting other high schools in the area to see if an agreement could be reached that would allow A.S. to attend a high school other than CHRHS.  *Id*. The

---

[22] The minutes of the October 12, 2005 PET meeting state, among other things: "Classroom Modifications: create a non-threatening learning environment where it is safe to ask questions and seek extra help, teachers need to be aware of Bi-Polar symptoms as well as how does [A.S.] manifest her Bi-Polar symptoms, verification of understanding, access to teacher notes, crisis plan if [A.S.] has anxiety at school.  It would be useful to include Dr. Miller for this. . . . Behavior Strategies – Identify target areas for positive behavior support plan with Jennifer Miller."  Record, Vol. I at 150.

PET discussed the Zenith program, the District's alternative-education program, as another option for A.S. *Id.* That program, which is not located at CHRHS, could include special-education support or instruction as needed, although not all participants are eligible for special education. *Id.*; *see also* Record, Vol. IV at 809-10 (Foreman testimony).

51.     At the conclusion of the meeting, the PET agreed to meet again soon to discuss placement. Hearing Decision at 20, ¶ 43; Record, Vol. I at 150. The District thought that the Parents accepted the basic components of the IEP, which needed to be "more thorough," and that the PET could explore placement options. *Id.*; *see also* Record, Vol. IV at 809 (Foreman testimony).[23] An IEP document was faxed to the Parents later that week. Hearing Decision at 20, ¶ 43; Record, Vol. IV at 810 (Foreman testimony).[24] The IEP document provided special-education instruction or support for eighty minutes per day, Hearing Decision at 20, ¶ 43; Record, Vol. I at 151, or one-quarter of A.S.'s school day, Record, Vol. IV at 811 (Foreman testimony). A.S. would not have had an educational technician or other support person assigned to her during the remaining three-quarters of the school day; the District did not feel it was necessary. Record, Vol. I at 151, Vol. IV at 825-26 (Foreman testimony). The IEP document also provided for psychiatric consultation monthly or "as needed." Hearing Decision at 20, ¶ 43; Record, Vol. I at 151. It stated that A.S., along with her psychiatrist, would assist in development of a behavior-support plan. Hearing Decision at 20, ¶ 43; Record, Vol. I at 157.[25] The IEP document incorporated many of the specific educational recommendations made by

---

[23] C.G. testified that the Parents did agree to the "components" of the IEP at the October 12 PET meeting although not to the IEP itself, a draft of which she understood was to be prepared and discussed at the next PET meeting. *See* Record, Vol. IV at 745-46.

[24] The Hearing Officer stated that the District provided the Parents a "copy of the IEP drafted at [the October 12] meeting." Hearing Decision at 20, ¶ 43. I agree with the Parents that this is inaccurate inasmuch as some changes were made to the draft document subsequent to the October 12 meeting. *See* Parents' Brief at 16, ¶ 55; Record, Vol. IV at 809-10, 825 (Foreman testimony). The District actually faxed two copies of an IEP to the Parents, one on October 14 and another on October 18, after District personnel discovered that a page accidentally had been omitted during the October 14 fax transmission. *See* Record, Vol. IV at 747 (C.G. testimony); 810 (Foreman testimony). The IEP document contained in the Record is the full document faxed on October 18. *See id; see also id*, Vol. I at 151-62.

[25] At hearing, Foreman testified that the psychiatric consultation would have taken the form of a contract the District would have (*continued on next page*)

Dr. Slap-Shelton.  Hearing Decision at 20, ¶ 43; *compare* Record, Vol. I at 152-56, 159-60 *with id.* at

188-89.[26]  It contained four educational goals: (i) to develop strategies to improve organizational

skills in order to maintain passing grades, (ii) to develop a positive support plan with assistance from

A.S.'s psychiatrist and school staff so that A.S. could identify stages of her current functioning and

acceptable strategies to use for each, (iii) to achieve and maintain passing grades (and address some

mild delays noted in Dr. Slap-Shelton's evaluation), and (iv) to comply with the school attendance

policy.  Hearing Decision at 20, ¶ 43; Record, Vol. I at 155-62.

52.      With regard to the first goal, improvement of organizational skills, the IEP document

called for A.S. to be given direct instruction in the resource room with short-term objectives of

(i) using a daily planner and reviewing the planner with assigned staff daily ninety percent of the time,

(ii) developing study-skills strategies and a list of ways to make course expectations more

manageable, such as chunking and prioritizing, and using those strategies ninety percent of the time,

and (iii) developing and using time-management techniques (such as prioritizing and organizing work

time in fifteen-minute chunks).  Record, Vol. I at 156.  With regard to the second goal, development of

a positive support plan, the IEP document called for A.S., given the opportunity to identify the state of

her functioning, to "choose an appropriate strategy from the attached behavior plan"; however, no

---

entered into, preferably with Dr. Miller, for her input in developing the safety/crisis and behavior/positive-support plans.  *See* Record, Vol. IV at 811.  Foreman stated that she suspected "that we would have to front load this pretty significantly in terms of hours that we'd want to contract with Dr. Miller about, so that we could have a plan for re-entry into a program – a public school program or into a combination of Zenith – that's a public school program [–] and special education[.]"  *Id.*

[26] While the Hearing Officer described the IEP document as incorporating "most" of Dr. Slap-Shelton's specific educational recommendations, the document more fairly can be said to incorporate "many" of Dr. Slap-Shelton's recommendations plus other strategies.  *Compare* Hearing Decision at 20, ¶ 43; Record, Vol. I at 152-56, 159-60 *with* Record, Vol. I at 188-89.  Per the IEP document, A.S. was to be provided, *inter alia,* preferential seating; a quiet, distraction-free area for quiet study time and test-taking; clear boundaries; use of a laptop for note-taking; teacher lecture notes (when possible); study-cooperative group learning; a daily check-in; more time to complete tests and other skills assessments when needed to eliminate text anxiety; an environment where she felt safe to ask clarifying questions and seek help; a check for understanding, with nonjudgmental feedback; reminders to use her planner on a daily basis; and help setting up a system of organization and strategies for chunking assignments into smaller, more manageable tasks.  *See* Record, Vol. I at 153.

behavior plan was attached. *Id*. at 158, Vol. IV at 826 (Foreman testimony).[27]  With regard to the third

goal, achievement of passing grades, the IEP document called for A.S. to be given a tutorial study hall

in the resource room and support to prepare for her regular class assignments on a daily basis ninety

percent of the time. *Id*., Vol. I at 160.[28]  Finally, with regard to the final goal, attendance, the IEP

document provided that, given a daily check-in with the special-education teacher, A.S. would fill out

the attendance form for the day, keeping track of her own attendance on a daily basis. *Id*. at 162.[29]

The IEP document did not provide for direct social-work or therapeutic services for A.S.  *Id*. at 151-

62, Vol. IV at 826 (Foreman testimony).  The District envisioned the family continuing the clinical

counseling it had set up with Dr. Miller, with the District contracting with Dr. Miller to craft

appropriate crisis/safety and behavior-support plans and consulting on an ongoing basis with her as

needed. *Id*., Vol. IV at 811-12, 826 (Foreman testimony).

      53.      Following the October 12 PET meeting B.S. visited the Zenith program. *Id*. at 795-96

(B.S. testimony).  He also took a day to visit the F.L. Chamberlain School ("Chamberlain"), a

therapeutic boarding school in Middleboro, Massachusetts that focuses on students with ADHD and

bipolar disorder. *Id*., Vol. II at 449, Vol. IV at 797 (B.S. testimony).[30]  Zenith has twenty-four students

who attend it for either a full or a half day, some of whom have attention-deficit problems and at least

one of whom has had a significant mental-health diagnosis.  Hearing Decision at 20, ¶ 43; Record,

---

[27] At hearing, Foreman testified that this plan would have been developed in conjunction not only with Dr. Miller but also with the family, and that helping the family get A.S. to school would have been part of that plan.  Record, Vol. IV at 812, 826.

[28] At hearing, Foreman testified that the forty-minute "tutorial" was not tutoring but rather was a "tutorial study hall" to help A.S. complete homework at school.  Record, Vol. IV at 811.

[29] At hearing, Foreman testified that the District would have to "think outside the box" when it came to A.S.'s attendance, as it has for other students via an "administrative discretion" section of its attendance policy excusing strict adherence to that policy in various circumstances.  Record, Vol. IV at 812.

[30] The October 12, 2005 PET meeting minutes reflect that B.S.'s only placement-research assignment was to visit Zenith. *See* Record, Vol. I at 150.  At hearing, he testified that he had been willing at the time to visit other potential placements (such as other area high schools) but did not do so because he understood that Foreman was to make arrangements for such visits, and she did not. *See id*., Vol. IV at 795-96.  Foreman testified that, while she indeed explored several placement options (such as other area high schools and the private Spurwink program), she understood that she was to report on the results of her research at the next PET meeting, not make (*continued on next page*)

Vol. IV at 796 (B.S. testimony), 809, 826 (Foreman testimony).  It is a structured, supportive, nurturing program.  Hearing Decision at 20, ¶ 43; Record, Vol. IV at 810 (Foreman testimony).  There are group sessions with a social worker in which participants discuss social issues.  Hearing Decision at 20, ¶ 43; Record, Vol. IV at 797 (B.S. testimony).  The Zenith director told B.S. she thought A.S. would fit in well there, but B.S. was concerned that the program lacked sufficient structure for his daughter.  Hearing Decision at 20, ¶ 43; Record, IV at 796-97.[31]

54.     The PET met again on October 20 to discuss placement.  Hearing Decision at 21, ¶ 45; Record, Vol. I at 150, Vol. IV at 813 (Foreman testimony).  That meeting was very contentious, and the team was unable to reach consensus on that issue.  Hearing Decision at 21, ¶ 45; Record, Vol. IV at 798 (B.S. testimony), 813  (Foreman testimony).  The team did not discuss the proposed IEP at all, as the Parents continued to insist on a therapeutic boarding school, while the rest of the PET felt that A.S. could be educated in a public-school setting and felt that the Zenith program would be a good fit for her.  Hearing Decision at 21, ¶ 45; Record, Vol. IV at 748 (C.G. testimony), 798-99 (B.S. testimony), 813 (Foreman testimony).  The Parents then notified the PET that they would be seeking a unilateral private residential placement for A.S. and requesting reimbursement from the District for it.  Hearing Decision at 21, ¶ 45; Record, Vol. IV at 748 (C.G. testimony).  The IEP document was not completed, and the positive behavior-support plan left undeveloped, because the PET process broke down at the October 20 meeting.  Hearing Decision at 31; Record, Vol. IV at 813 (Foreman testimony).[32]

---

arrangements for B.S. to visit those facilities in the interim. *Id*. at 810, 825.

[31] The Hearing Officer stated that although "the father thought the student would fit in [Zenith], he was concerned that it was not sufficiently structured."  Hearing Decision at 20, ¶43.  However, B.S.'s testimony, which the Hearing Officer cites, *see id*., supports a finding that the Zenith program director told B.S. she thought A.S. would fit in well, not that B.S. thought she would, *see* Record, Vol. IV at 796.

[32] The Parents urge the court to reject the Hearing Officer's (and the District's) description of the substance of the October 20, 2005 PET meeting, asserting that (i) the District mischaracterizes the fall 2005 PET process by implying that the Parents were uncooperative and dogmatically pursued a residential placement, (ii) the Parents evidenced an openness to other placements, with B.S. having agreed at the October 12, 2005 PET meeting to visit the Zenith program and other area high schools, (iii) B.S. did visit Zenith and would have visited other area high schools if the District had made arrangements for him to do so, but it dropped the ball, (iv) the Parents assumed (*continued on next page*)

55.     A due-process hearing was held on October 26, October 31, November 2 and November 9, 2005.  Hearing Decision at 1.  With respect to the adequacy of the IEP, Dr. Miller testified that A.S. needed twenty-four hour supervision in a therapeutic setting, as her needs went far beyond what the District's IEP offered.  Hearing Decision at 21, ¶ 44; Record, Vol. IV at 730-31 (Miller testimony).  Dr. Slap-Shelton thought the proposed IEP could be a reasonable plan once A.S. was stabilized.  Hearing Decision at 21, ¶ 44; Record, Vol. IV at 708 (Slap-Shelton testimony).[33]  Dr. McCabe testified that he disagreed that A.S. required a therapeutic residential academic setting.  Record, Vol. IV at 881 (McCabe testimony).  He stated: "There's nothing out of the norm that she has

---

that the IEP faxed to them following the October 12 meeting was merely a draft, (v) when they attempted at the outset of the October 20 meeting to offer constructive feedback on the IEP, District personnel cut them off, announcing that the IEP constituted the District's "final offer" and was to be implemented at CHRHS, (vi) at that point, the Parents had no choice but to announce they would make a unilateral private placement of A.S., and (vii) any blame for failing to devise a program capable of meeting A.S.'s needs falls squarely on the shoulders of the District.  See Plaintiffs' Reply Memorandum of Law ("Parents' Reply Brief") (Docket No. 45) at 3-4; Parents' Brief at 16-17 & 31 n.17.  The Record contains no official minutes of the October 20, 2005 PET meeting.  The Parents sought permission to add them, but primarily for the purpose of highlighting their many alleged inaccuracies and omissions.  See Record-Supplementation Decision at 5-6.  I denied that request, agreeing with the District that no useful purpose would be served in admitting purportedly inaccurate minutes of a meeting about which both its witnesses and the Parents had testified at hearing.  See id. at 6.  After carefully reviewing both the Parents' and District personnel's descriptions of events leading up to the October 20 meeting and the substance of the meeting itself, I determine that the Hearing Officer's recitation is supported by a preponderance of the evidence.  While B.S. did visit the Zenith program and might have been willing to visit other public-school placements, B.S. himself testified that (i) he did not see how his daughter possibly could go into a mainstream class as of the fall of 2005, (ii) doing so was a prescription for failure, (iii) the Parents disagreed at the October 20 meeting with a public-school placement and, (iv) at the end of the meeting, the Parents inquired whether, in view of Dr. Miller's and Dr. Slap-Shelton's recommendations, the District would consider a residential placement, whereupon the District said no.  See Record, Vol. IV at 798-99.  In like vein, C.G. testified that the Parents made clear at the October 20 PET meeting that "we didn't feel that the public school or Camden Hills Regional High School or the Zenith Program [was] sufficient for our daughter's psychological and educational needs. . . .  I think we made it pretty clear that we felt a therapeutic boarding school was probably the best place for her."  Id. at 748.  As B.S. put it, describing the October 20 meeting: "[I]t was very clear that the school had their impressions and their plan and we had ours.  And it . . . was like oil and water.  It just wasn't meeting.  There was very little room for discussion."  Id. at 798.  Further, while Foreman evidently did characterize the IEP document during the contentious October 20 meeting as the District's "final offer," see, e.g., id. at 747-48 (C.G. testimony), 825 (Foreman testimony), I am satisfied that she did not mean to convey that the IEP document itself was finalized.  She testified that, while the Parents did present a two- or three-page list of concerns about, inter alia, the proposed IEP, which she permitted B.S. some time to go through, "We really never made it to the IEP because it really became clear that the family wasn't really interested in the IEP as it was developed.  They really were interested in residential placement. . . .  The school's position without reservation was that they felt that that IEP was reasonably calculated to be portable enough to be done at a public school.  The parent's position certainly was not that and that was very clear that they felt it wasn't appropriate.  And so, at that point we really kind of said we really can't go any further."  Id. at 813.

[33] Dr. Slap-Shelton testified: "I thin[k] [the IEP] potentially could be a reasonable plan for [A.S.] once she was truly recovered and stable . . ., but I don't think it meets her needs at present in that she really – I do not believe that she would be able to access the offerings of this program unless she were in a very structured therapeutic setting.  I feel that it's not providing the level of structure that she needs."  Record, Vol. IV at 708 (Slap-Shelton testimony).

that the public school in this day and age doesn't handle.  As a matter of fact she would be in the light side of that."  *Id*.

56.    By decision dated December 5, 2005, as amended December 16, 2005, the Hearing Officer found in favor of the District on all issues presented, ruling that the District (i) did not violate its child-find obligation or its obligations to evaluate, identify and place A.S. in special education, (ii) did not err in refusing to find A.S. eligible for special education on March 3, 2004 and (iii) did not fail to provide A.S. a timely offer of a free appropriate public education ("FAPE"), as a result of which the family was not entitled to reimbursement of costs incurred in connection with the unilateral placement at Moonridge.  Hearing Decision at 34.  She also ruled that the family was not entitled to an order placing A.S. in a therapeutic placement going forward.  *Id*.[34]

57.    With respect to the Parents' bid for reimbursement of Moonridge tuition and related costs, the Hearing Officer reasoned that:

A.    The District did not violate its "child-find" obligation with respect to A.S.  *Id*. at 22-24.  The District did not have reason to suspect that A.S. was a child with a disability requiring special education until approximately the same time that Vohringer offered to explore Section 504 options with the Parents, whereupon the Parents elected to make a special-education referral.  *Id*. at 23.

B.    Foreman scheduled a PET within fifteen school days of receipt on February 17, 2004 of a special-education referral from B.S., as required by Maine Special Education Regulations, Code Me. R. 05-071 ch. 101 ("MSER"), § 7.7.  *Id*. at 25.  When the PET did convene on March 3, 2004, the District did not err in failing to identify A.S. as a student

---

[34] The Parents do not seek reimbursement for Kents Hill costs.  *See* Parents' Brief at 14 n.9.

eligible for special education given the "scant and very inadequate" information provided. *Id.* at 25-26.

        C.     The District had "an absolute right to perform PET-ordered evaluations with [its] own personnel." *Id.* at 27. It did not err in failing to conduct that evaluation within forty-five school days of receipt of the Parents' written consent inasmuch as the Parents' unilateral placement of A.S. in Utah deprived it of a reasonable opportunity to conduct such an evaluation. *Id.* at 27-28. Moreover, despite the District's repeated requests to evaluate A.S. when she returned for home visits, the Parents did not inform the District when she was home and were very uncooperative about allowing her to be evaluated by the District, insisting several times (erroneously) that they felt the District had adequate information to make an identification determination. *Id.* at 28.

        D.     The Parents' failure to cooperate deprived the District of a reasonable opportunity to evaluate A.S. and, in line with considerable authority, worked a forfeiture of any claim to tuition reimbursement for the unilateral Moonridge placement. *Id.* at 28-29.

58.    With respect to the Parents' bid for coverage by the District of costs of a unilateral therapeutic placement going forward, the Hearing Officer ruled that the Parents had failed to show that the program offered by the District was inappropriate. *Id.* at 29-34. She summarized:

> Based upon the evidence, I believe that the student's needs can be met with the proposed IEP, once the behavioral supports discussed by the PET have been developed, and with clarification of precisely what services "psychiatric consultation as needed" would provide. Although Cindy Foreman testified that such services would be "front loaded," the IEP requires more specification than that, and should contain a specific level [of] support from a social worker or psychologist.

> Regarding placement, there is evidence against returning the student to CHRHS right now, but she would benefit from a highly structured public school program, such as a day treatment program in a neighboring district, or Zenith, if her IEP could be implemented there without going to CHRHS for part of the day. With the supports

discussed above, this type of placement would provide for the structure the student needs while allowing her to be educated in the least restrictive educational setting.

There is no doubt that the student fared very well at Moonridge, and she might do well in another similar placement, such as the Chamberlain School proposed by the parents. While such a restrictive placement would likely relieve some of the family's stress, it cannot be justified as necessary for the student to make educational progress.

*Id*. at 33.

59.     After the hearing, A.S.'s mental health continued to decline.  Deposition of B.S. ("B.S. Dep.") (Docket No. 36) at 5-6.[35]  She often refused to take her medications as prescribed.  *Id*. at 5.  As a result, she cycled between mania and deep depression.  *Id*.  In November 2005 one of her friends committed suicide.  *Id*. at 6.  She took his death very hard and became increasingly despondent.  *Id*.

60.     Post-hearing, the Parents continued to pursue an appropriate private placement for A.S., eventually choosing Chamberlain.  *Id*.  They favored Chamberlain because it featured a trained clinical staff of psychiatrists, therapists and nurses seemingly capable of providing the high level of structure the Parents felt A.S. needed.  *Id*. at 7-8.

61.     A.S. was accepted by Chamberlain in early December 2005 but did not start immediately because of the Parents' difficulties in securing funding for its substantial tuition and related expenses.  *Id*. at 8-9.  Upon receiving the Hearing Officer's adverse decision, the Parents discussed it with A.S. *Id*. at 9-10.  Although she initially seemed to understand, she woke up at 2 a.m. crying.  *Id*.  She told her parents that she saw herself as a failure who would never amount to anything and be a burden to them.  *Id*.  She also informed her parents that if she had to return to CHRHS, she feared she would commit suicide.  *Id*. at 10-11.

62.     A.S. was scheduled to enter Chamberlain on January 25, 2006.  *Id*. at 12.  As the day approached, her mood swings intensified, and she became significantly more violent toward her little

---

[35] I permitted the Parents to supplement the record with deposition testimony of B.S. documenting A.S.'s status and programming (*continued on next page*)

brother. *Id.* at 11-12. She refused to go to therapy or take medications, telling her parents they did not help her. *Id.* at 11. At the end of January 2006 the Parents read A.S.'s diary, which contained multiple vivid entries concerning her suicide and death. *Id.* at 13-14. For example, one of A.S.'s entries discussed what it would be like to hang herself and to see her own blood on the ground. *Id.* at 14. The Parents sought advice from Dr. Miller, and the three jointly determined to admit A.S. to a psychiatric hospital. *Id.* at 14.

63.     A.S. was admitted to Spring Harbor Hospital on February 3, 2006. *Id.* at 15. Upon admission, she disclosed to her parents that she had planned to run away with a friend the following day and that she was suicidal and had been thinking of plans for suicide. *Id.* at 17. Her physician at Spring Harbor, Alexander Walker, M.D., stated that A.S. was admitted to the hospital because she was "actively dangerous towards her mother and brother and clearly has not been compliant with medication and has been dysfunctional at home, at school and in the community[.]" Spring Harbor Discharge Summary ("Discharge Summary"), Exh. B to B.S. Dep., at 4. At admission, Dr. Walker rated A.S. a 10 on the GAF scale, which put her in the lowest category of functioning. *Id.* at 6; Children's Global Assessment of Functioning (GAF) Scale ("GAF Scale"), attached thereto. This level of functioning describes a child who "[n]eeds [c]onstant supervision (24-hr care) due to severely aggressive or destructive behavior or gross impairment in reality testing, communication, cognition, affect, or personal hygiene[.]." GAF Scale. Dr. Walker listed A.S.'s diagnoses as including bipolar disorder, PTSD, ODD, ADHD, poly substance abused and self-injurious behaviors. Discharge Summary at 4-5.

64.     A.S.'s weeklong stay at Spring Harbor was helpful. B.S. Dep. at 16-17. Despite some improvement, Dr. Walker rated her functioning at discharge as only a 40 on the GAF scale, although he

---

since her hearing closed on November 9, 2005. *See* Record-Supplementation Decision at 6-8.

noted there may have been times during the previous year when she functioned possibly as high as a code 60, with just moderate difficulties.  Discharge Summary at 6.  A GAF score of 40 describes a child with "[m]ajor impairment of functioning in several areas and unable to function in one of these areas, e.g., disturbed at home, at school, with peers, or in society at large, e.g., persistent aggression without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, suicidal attempts with clear lethal intent; such children are likely to require special schooling and/or hospitalization or withdrawal from school (but this is not a sufficient criterion for inclusion in this category)[.]"  GAF Scale.

65.     Spring Harbor Hospital discharged A.S. on February 10 with a plan to enter Chamberlain.  B.S. Dep. at 19-20; Discharge Summary at 5.  The Parents enrolled A.S. at Chamberlain on February 13.  B.S. Dep. at 20.  In her first few weeks there, A.S. struggled with the transition; since then, however, she has done well there.  *Id.* at 20-23.  She recognizes the value of the structure imposed at Chamberlain, although she remains fragile and continues to have difficulty when she leaves its structured environment.  *Id.* at 23, 26, 30-31.

66.     At Chamberlain, A.S. participates in both individual and group therapy on a weekly basis.  F.L. Chamberlain School-Administrative Data Sheet [and IEP] ("Chamberlain IEP"), Exh. C to B.S. Dep., at 7.  Although she continues to struggle with depression and anxiety, she "is highly motivated in her treatment and is expected to continue to make gains in her emotional/behavioral functioning."  *Id.* at 18.  She now also recognizes the need to take her medications.  B.S. Dep. at 26.

67.     B.S. describes A.S.'s academic gains at Chamberlain as "phenomenal."  *Id.* at 22.  The academic program at Chamberlain is geared toward students with bipolar disorder and ADHD.  *Id.* at 27.  A.S. has responded well to this academic environment; she participates in class, seeks help and shows interest in her courses.  *Id.* at 23, 27.  Her grades have been As and Bs except for a C in

chemistry.  *Id*. at 27.  She has been thinking about her future and researching careers; she thinks she

may like to become a dental hygienist.  *Id*. at 28-29.  She has taken the SAT examination and is

planning on taking it again.  *Id*. at 29.

68.     Although A.S. has succeeded in the highly structured 24/7 environment at Chamberlain,

she decompensates easily when removed from this environment on home visits.  *Id*. at 23, 30-32.

School officials have told the Parents that A.S. likely will need to remain there until her graduation

from high school, which, if she continues to progress at the same rate, will occur in June 2007.  *Id*. at

29-30.

69.     Through April 2006, the Parents had paid $23,566.91 in tuition and related costs

associated with A.S.'s placement at Chamberlain.  Summary of A.S. Expenses, Exh. D to B.S. Dep., at

1-2.  They expected to incur an additional $97,702.34 in tuition and related expenditures to maintain

her placement at Chamberlain through January 2007.  *Id*.

## II.  Proposed Conclusions of Law

1.     Congress enacted the IDEA to ensure that children with disabilities receive a FAPE.

*See, e.g*., 20 U.S.C. § 1400(d)(1)(A).  A FAPE consists of special education and related services that

are provided to children with disabilities at public expense and under public supervision during

preschool, elementary school and secondary school.  *See id*. § 1401(9).  The states and "local

educational agencies" located within them are responsible for ensuring that children with disabilities

receive a FAPE.  *See, e.g., id*. § 1412-13.  In return, those bodies receive funds from the federal

government for use in implementing the provisions of the IDEA.  *See, e.g., id*. §§ 1412(a), 1413(a).

2.     A PET, consisting of a disabled child's parents, teachers, school administrators and

others who know the child well, oversees the child's special education.  *See id*. § 1414(d)(1)(B);

MSER § 8. The PET develops, reviews and revises as appropriate an IEP outlining the special-education services the child should receive. *See* 20 U.S.C. §§ 1414(d)(3) & (4)(A).

3.      Per 20-A M.R.S.A. § 7207-B(2)(A), a parent, surrogate parent, guardian or school administrative unit may request the MDOE commissioner "to appoint an impartial hearing officer who shall conduct a hearing regarding the identification, evaluation and educational program of the student and shall make findings of fact and issue a decision[.]"

4.      A party dissatisfied with the decision of an MDOE hearing officer may appeal that decision to the Maine Superior Court or the United States District Court. *Id*. § 7207-B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).

5.      The IDEA provides that a court reviewing the decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

6.      "The role of the district court is to render bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted). "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court." *Id*. (citations and internal quotation marks omitted). *See also, e.g., Lamoine Sch. Comm. v. Ms Z. ex rel. N.S.*, 353 F. Supp.2d 18, 29-30 (D. Me. 2005) ("The district court's standard of review is synthesized as follows: First, the Court carefully reviews the record of the due process hearing. Second, appropriate deference is given the Hearing Officer and his expertise,

particularly with regard to factual determinations.  Finally, the Court makes an independent decision whether the hearing officer's determination is supported by a preponderance of the evidence.") (citation and internal quotation marks omitted).

7.    The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise.  *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP provides the hope of educational benefit.").  Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole."  *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)).

8.    In an IDEA appeal, two questions are presented: "First, has the State complied with the procedures set forth in the Act?  Second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Hampton*, 976 F.2d at 52 (citation and internal quotation marks omitted).

9.    The burden of proof rests on the party challenging the hearing officer's decision. *Id.* at 54; *see also, e.g., Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R.*, 176 F. Supp.2d 15, 23 (D. Me.

2001) (rec. dec., *aff'd* Feb. 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003) ("The party

allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary

to law or without factual support.").

10.     When a school violates the provisions of the IDEA in a manner that deprives a student

of a FAPE, a court "shall grant such relief as the court  determines is appropriate."  20 U.S.C.

§ 1415(i)(2)(C)(iii).   Nonetheless, "[m]onetary recovery in such suits is limited to compensatory

education and equitable remedies that involve the payment of money, such as reimbursements for

educational expenses that would have been borne by defendants in the first instance had they properly

developed and implemented an IEP."  *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 19 (1st Cir. 2006).

11.     The Parents seek reimbursement of the cost of their unilateral placements of A.S. at

Moonridge and at Chamberlain as well as compensatory educational services.  *See* Parents' Brief at 1,

45.

12.     With respect to the remedy of reimbursement, this court has noted:

> Where a parent is dissatisfied with the IEPs developed by the school district for her
> child, the Supreme Court has provided the parent may, at her own financial risk,
> unilaterally place her child in a private school.  If a federal court later determines that:
> (1) the student was in need of special education services; (2) that the IEP developed
> by the school district was inappropriate; (3) that the unilateral placement by the parent
> was proper; and (4) the cost of the private education was reasonable, then the court
> may order reimbursement for the parents.  Reimbursement is a matter of equitable
> relief, committed to the sound discretion of the district court[,] and is usually reserved
> for parties who prevail at the end of a placement dispute.

*Lamoine*, 353 F. Supp.2d at 31-32 (citations, footnote and internal quotation marks omitted).

13.     Congress has recognized that, in certain circumstances, reduction or denial of

reimbursement is appropriate, providing, in relevant part:

**(ii) Reimbursement for private school placement**

        If the parents of a child with a disability, who previously received special
        education and related services under the authority of a public agency, enroll the child

in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

**(iii) Limitation on reimbursement**

The cost of reimbursement described in clause (ii) may be reduced or denied –

\*\*\*

**(II)** if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

**(III)** upon a judicial finding of unreasonableness with respect to actions taken by the parents.

20 U.S.C. § 1412(a)(10)(C).  IDEA regulations echo these provisions.  *See* 34 C.F.R. § 300.148(c)-

(d) (formerly codified at 34 C.F.R. § 300.403(c)-(d)).[36]

14.    Whereas tuition reimbursement is essentially a backward-looking form of relief, the

remedy of compensatory education  typically is prospective, "entitl[ing] [the] recipient to further

services, in compensation for past deprivations [of the IDEA], even after his or her eligibility for

special education services under [the] IDEA has expired."  *Ms. M. ex rel. K.M. v. Portland Sch.*

*Comm.*, 360 F.3d 267, 273-74 (1st Cir. 2004) (citation and internal punctuation omitted); *see also,*

*e.g., Diaz-Fonseca*, 451 F.3d at 32 ("As the term 'reimbursement' suggests, tuition reimbursement is a

backward-looking form of remedial relief; reimbursement merely requires the defendant to belatedly

---

[36] IDEA regulations were amended on August 14, 2006, effective October 13, 2006, to implement 2004 amendments to the IDEA. *See D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 508 n.6 (2d Cir. 2006); Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46,540 (Aug. 14, 2006).  In briefing the instant appeal, the parties cited to the version of the regulations in effect prior to October 13, 2006.  *See generally* Parents' Brief; Defendant's Memorandum of Law ("District's Brief") (Docket No. 40).  Although many of the regulations cited by the parties have been recodified, none has been amended in any respect material to the outcome of the instant appeal.  Accordingly, I have cited to the (*continued on next page*)

pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP. It goes without saying that those 'expenses' must be actual and retrospective, not anticipated. Indeed, this reasoning is at the heart of the distinction, recognized by this court, between 'tuition reimbursement' and 'compensatory education.'") (citations, footnote and internal punctuation omitted). As the First Circuit has observed:

> The nature and extent of compensatory education services which federal courts have recognized varies according to the facts and circumstances of a given case. Such an award may include extra assistance in the form of tutoring, or summer school while students are still within the age of entitlement for regular services under the Act, or an extended period of assistance beyond the statutory age of entitlement.

*Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 188 n.8 (1st Cir. 1993) (citations omitted).

### A. Reimbursement of Moonridge Costs

15.     The Parents seek reimbursement of Moonridge costs on the basis that the District denied A.S. a free appropriate education by neglecting to locate, evaluate or identify her or program for her and place her during the two years ending in October 2005. *See* Parents' Brief at 35-36. The District rejoins that the Hearing Officer got it right, properly exercising her discretion to deny the Parents Moonridge cost reimbursement on the basis of their failure to make A.S. "available" for evaluation and, in any event, correctly ruling that the District had not violated its child-find, evaluation and identification obligations to A.S. *See* District's Brief at 14-30. After careful review of the entire Record, I agree that the Hearing Officer properly denied reimbursement for Moonridge costs.

16.     The Parents argue, in essence, that through October 2005 the District committed sufficiently serious procedural violations to deny their daughter a FAPE. *See* Parents' Brief at 42; *see also, e.g., Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 765 (6th Cir. 2001) ("[A] procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school district's failure to

---

version of the regulations that became effective October 13, 2006, adding a parenthetical reference to the prior version if recodified.

comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents."); *Schoenbach v. District of Columbia*, 309 F. Supp.2d 71, 78 (D.D.C. 2004) ("Circuits that have addressed this question head on have consistently held that procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity.") (citation, footnote and internal punctuation omitted).   In addressing this question, a court appropriately takes into consideration the extent to which  parents' own actions frustrated attempts by a school district to comply with the procedural requirements of the IDEA.  *See, e.g., Patricia P. v. Board of Educ.*, 203 F.3d 462, 468 (7th Cir. 2000) ("[A] parent's right to seek reimbursement for a unilateral placement of their child is available only upon a finding that, after cooperating with the school district, there are sufficiently serious procedural failures by the school district.") (citations and internal quotation marks omitted).

        17.    The IDEA imposes an affirmative obligation on schools to ensure that "[a]ll children with disabilities . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated[.]"  20 U.S.C. § 1412(a)(3); *see also, e.g., Greenland Sch. Dist v. Amy N. ex rel. Katie C.*, 358 F.3d 150, 157 (1st Cir. 2004); *Seattle Sch. Dist. No. 1 v. B.S. ex rel. A.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996).  This so-called "child-find" obligation requires that policies and procedures be in place to locate and timely evaluate children with suspected disabilities within a public school's jurisdiction, including "[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade[.]"  34 C.F.R. § 300.111(a) & (c)(1) (formerly codified at 34 C.F.R. § 300.125(a)(1) & (2)(ii)); *see also* MSER § 7.2.  In other words, "the child-find duty is triggered when the state or [local educational agency] has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability."  *Department of Educ. v.*

46

*Cari Rae S*., 158 F. Supp.2d 1190, 1194 (D. Haw. 2001) (citations and internal punctuation omitted);

*see also, e.g., W.B. ex rel. E.J. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995) (child-find duty requires

identification and evaluation "within a reasonable time after school officials are on notice of behavior

that is likely to indicate a disability") (footnote omitted).

18.     In addition, Maine regulations decree: "Local policy shall establish a process whereby

students 'at risk' are identified, evaluated, and referred as appropriate to the P.E.T.  Such students may

include individuals who have accumulated 45 absences during a school year, have been suspended or

removed in excess of 10 days during a school year, students who have experienced an illness or

accident likely to cause neurological or emotional impairment, etc."  MSER § 7.7(D).  As the District

posits, *see* District's Brief at 19, this provision suggests that frequent absences and significant

disciplinary referrals are the kinds of circumstances that can trigger a school's referral duties.  A

referral to a PET, whether made by school staff, a parent or others, is to be "acted upon in a timely

manner[,] and a Pupil Evaluation Team shall convene within 15 school days of the receipt of the

referral to review existing evaluation data and determine the need for additional evaluations[.]"  *Id.* §

7.7.[37]

19.     The Hearing Officer found, and the Record supports, that although C.G. used the term

"at risk" to describe A.S. to Vohringer early in the school year, (i) teachers were unaware during the

fall of 2003 that A.S. was a sexual-abuse victim (Vohringer having reasonably chosen to keep that

information confidential when so informed in October 2003), (ii) A.S. appeared to be a typical

---

[37] The Parents point out, correctly, that MSER § 7.7(D) does not purport to define the entire universe of "at risk" children but rather supplies examples.  *See* Parents' Reply Brief at 7-8; MSER § 7.7(D).  They suggest that A.S.'s situation fit within, or was analogous to, one of the examples supplied in section 7.7(D) – that of a child "who [had] experienced an illness or accident likely to cause . . . emotional impairment" – as a result of the trauma she experienced when she learned on December 19, 2003 that her childhood perpetrator was to speak as a guest lecturer in her science class.  *See* Parents' Reply Brief at 7-8 n.5.  I agree that A.S.'s situation can be analogized to that of a child who has suffered an accident likely to cause emotional impairment; however, school personnel did not possess sufficient information (from either first-hand observation or parental disclosure) to appreciate the magnitude of the trauma until the end of January 2004.

freshman, more concerned with her social life than academics, (iii) it was not unusual for freshmen to have trouble completing homework assignments, and (iv) even after the triggering incident on December 19, 2003, A.S. appeared fine when in school. *See* Hearing Decision at 23. No school personnel were made aware of A.S.'s mental-health diagnoses, her increasingly combative behavior at home or her growing resistance to attending school until the third week in January 2004, when the Parents disclosed that information to Vohringer. As the Parents themselves acknowledge, the District was on notice of A.S.'s serial absences from school and her first-semester grades, which were all Ds and Fs except for a C- in physical education, only as of January 27. *See* Parents' Brief at 37. The Hearing Officer reasonably determined that only at that point, when these factors converged, did the District have reason to suspect that A.S. might be a child with a disability in need of special-education services. *See* Hearing Decision at 23.

20.     The Parents suggest that they "attempted to refer their daughter for PET consideration, only to be steered away by Five Town – through misinformation – for over another month." *See* Parents' Brief at 37. However, as discussed above, the Hearing Officer supportably found that Vohringer suggested and promptly arranged a Section 504 meeting, which the Parents canceled, and the Parents then in any event shortly thereafter requested a PET meeting, which Foreman scheduled for the next available mutually convenient school day (within fifteen school days of her February 17 receipt of the referral, as required by MSER § 7.7).[38] In any event, as the District suggests, *see* District's Brief at 21, the delays from January 27 (the date by which the Parents assert the school was "on notice" of A.S.'s serial absences and poor first-semester report card) to when Foreman first

_____

[38] The Parents blame Foreman for having discouraged them during C.G.'s February 3 call from viewing their daughter as eligible for special education, whereupon they canceled the February 6 meeting Vohringer had arranged. *See* Parents' Brief at 9, ¶ 35. As noted above, Foreman clarified that the Parents could not simply assume that a PET would find A.S. eligible for special education or, if so, support a residential placement for her; however, she did not state that A.S. was ineligible for special education or a residential placement.

endeavored to schedule a PET (on February 17), and even to when the PET meeting finally was held (on March 3), are considerably shorter than the twelve-week or greater delays found to constitute, or raise triable issues regarding, child-find violations, *see, e.g., Matula*, 67 F.3d at 501 (triable issue whether delay of six months from notice and personal observation of behavior indicating a qualifying disability until referral for evaluation constituted child-find violation); *New Paltz Cent. Sch. Dist. v. St. Pierre ex rel. M.S.*, 307 F. Supp.2d 394, 401 (N.D.N.Y. 2003) (delay of approximately ten months from time mother informed school district that son was experiencing difficulties until performance of comprehensive evaluation constituted child-find violation); *O.F. ex rel. N.S. v. Chester Upland Sch. Dist.*, 246 F. Supp.2d 409, 417-18 (E.D. Pa. 2002) (triable issue whether delay of almost twelve months from school district's observation that child was having emotional difficulties in school and had suffered at least one violent temper tantrum until completion of comprehensive evaluation constituted child-find violation); *Cari Rae*, 158 F. Supp.2d at 1195-97 (delay of at least six months from point at which school had reason to suspect child had disability to scheduling of PET constituted child-find violation); *Bristol Twp. Sch. Dist.*, 36 IDELR 145, at 626 (Pa. State Educ. Agency Feb. 20, 2002) (delay of twelve weeks from point at which numerous incidents had occurred at school where child's behavior reached crisis level, and IEP team should have been reconvened to readjust his IEP, to point where parent removed child from school denied child a FAPE during that period).

21.     Nor can the District be faulted for failing to identify A.S. as a child with a disability during the course of the initial PET meeting on March 3, 2004.  While the Parents took the position – both during the meeting and in subsequent communications – that the District had enough information to identify A.S. as a child with a disability and required no more, the District had a right to insist on conducting its own evaluation of A.S.  *See, e.g., P.S. v. Brookfield Bd. of Educ.*, 353 F. Supp.2d 306, 314 n.5 (D. Conn.), *adhered to on recon.*, 364 F. Supp.2d 237 (D. Conn. 2005), *aff'd*, 186 Fed. Appx.

79 (2d Cir. 2006) ("P.S. also spends a good deal of time in his brief explaining why the Board had no *need* to examine him.  That is beside the point.  The only question is whether the Board was *entitled* to examine him, and it was.  A school system may insist on evaluation by qualified professionals who are satisfactory to the school officials.") (citation and internal quotation marks omitted) (emphasis in original); *see also, e.g., Andress v. Cleveland Indep. Sch. Dist*., 64 F.3d 176, 178 (5th Cir. 1995) ("If a student's parents want him to receive special education under IDEA, they must allow the school itself to reevaluate the student[,] and they cannot force the school to rely solely on an independent evaluation."); *Gregory K. v. Longview Sch. Dist*., 811 F.2d 1307, 1315 (9th Cir. 1987) (parents must permit testing by school); *Falmouth Sch. Dep't*, 40 IDELR 83, at 332 (Me. State Educ. Agency Nov. 7, 2003) ("A school has an absolute right to perform P.E.T. ordered evaluations with its own personnel"); *Falmouth Sch. Dep't*, 102 LRP 4426, at 6 (Me. State Educ. Agency Apr. 24, 2000) ("A parent who desires for her child to receive special education must allow the school district to reevaluate the child using its own personnel; there is no exception to this rule.").[39]  As a matter of law, the District cannot be taken to task for failing to identify A.S. as a child with a disability prior to being given the opportunity to request and conduct its own testing.

22.     Alternatively, if one delves into the substance of the matter, I discern no basis on which to disturb the judgment of District personnel (and the Hearing Officer on appeal) that the District

---

[39] The Parents suggest that pre-1997 cases cited by the District for the proposition that a school has an absolute right to conduct its own evaluation of a student are inapposite inasmuch as the IDEA and federal and Maine regulations were amended in 1997 to "require the PET to review existing evaluation data on the student, including data provided by the parents, to determine, with input from the student's parents, what additional evaluation data, if any, is needed to evaluate the student."  Parents' Reply Brief at 10 n.7; *see also* 20 U.S.C. § 1414(c)(1), 34 C.F.R. § 300.305(a) (formerly codified at *id*. § 300.533(a)).  The Parents reason that because the District neglected to call A.S.'s treating physicians as promised, it failed to request and review current data, and therefore any request by the District to conduct its own evaluation was premature.  *See* Parents' Reply Brief at 10 n.7.  I disagree.  By the time the District sought the Parents' consent to evaluate A.S., it had in fact reviewed all "data" the Parents had actually "provided" during the March 3, 2004 PET meeting.  In any event, inasmuch as – even post-1997 – a school district retains the right to request an initial evaluation, *see* 20 U.S.C. § 1414(a)(1)(B) & (D); 34 C.F.R. § 300.300(a) (formerly codified at *id*. § 300.505(a) & (b)), the District cannot be faulted for failing to identify A.S. as a student with a disability as of March 3, 2004, before it even had an opportunity to make such a request.

lacked adequate information as of March 3, 2004 to identify A.S. as a child with a disability. The Parents presented District personnel for the first time at the March 3, 2004 PET meeting five documents: a list of parental concerns, the 1998 report of Dr. Dodge, the 2000 report of Dr. Fink and two brief, recent letters from Drs. McKinley and Vaughan. As Fetterman observed at the meeting, the Dodge and Fink reports were dated. *See* MSER § 9.11 (requiring that students be reevaluated "at least once every three years" to determine whether they continue to be disabled). In any event, those reports did not tend substantively to support the conclusion that A.S. was a child with an emotional disability.[40] Neither the Vaughan nor the McKinley letter contained evaluative data or educational recommendations of the sort the regulations contemplate a PET will obtain in identifying and programming for a student with a disability. *See, e.g., id*. § 9.2 ("Valid and reliable evaluative instruments and techniques that yield a description of the student as a learner shall be used. The focus of evaluations shall be on observable and measurable performance rather than causality or etiology. . . . Any modification and/or adaptation of the regular education program and support for the regular classroom teachers should be specified in the evaluation recommendations."). Further, while the Parents apprised the PET of A.S.'s crisis, diagnoses and her downward spiral at home, her teachers described her as appearing to be a typical freshman; even her serious homework-completion difficulties, which the teachers corroborated, were considered to be within the norm for freshmen particularly. Both federal and state regulations contemplate use of "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" about a child who might have a disability; the regulations forswear reliance on "any single measure or assessment as the

---

[40] A student has an "emotional disability" if he/she has "a condition which exhibits one or more of the following characteristics over a long period of time and to a marked degree that adversely affects the student's educational performance: A. An inability to learn that cannot be explained by intellectual, sensory, or health factors; B. An inability to build or maintain satisfactory interpersonal relationships with peers and teachers; C. Inappropriate types of behaviors or feelings under normal circumstances; D. A general pervasive mood of (*continued on next page*)

sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child[.]"  34 C.F.R. § 300.304(b) (formerly codified at *id*. § 300.532(b) & (f)); *see also* MSER §§ 9.1, 9.2.  In light of (i) the care and thoroughness with which the regulations contemplate that an identification decision will be made  and (ii) the scantness or staleness of the information provided, the reluctance of Fetterman and Foreman to identify A.S. on the spot as a student with a disability was hardly unreasonable.  *See Schwartz v. Learning Ctr. Acad.*, No. 4:00-CV-42, 2001 WL 311247, at *2, *6 (W.D. Mich. Jan. 17, 2001) (in absence of current evaluation data, three letters from  doctors treating student alleged to suffer from school phobia  insufficient to warrant identification as student with disability under Section 504).

23.      Beyond this, District personnel, who had only just been presented with the documentation at the meeting, evinced willingness to proceed at a reasonably brisk pace in the circumstances, offering to review the Parents' materials, talk to Drs. Vaughan and/or McKinley and get back to the Parents on additional testing requests within five calendar days (by March 8) – well within the period contemplated by Maine regulations.  *See* MSER § 9.17 ("If a recommended evaluation precedes a student's initial identification as a student with a disability, thereby requiring prior written parental consent, the administrative unit shall provide the parent with a consent for initial evaluation form after the members of the P.E.T. review existing evaluation data . . . but no later th[a]n 15 school days after the referral of the student for an evaluation.").

24.      The District did indeed transmit to the Parents by March 8  its additional testing requests; however, the Parents fault the manner in which it did so, asserting that, in contravention of the PET's March 3 determination and MSER § 9.8, District personnel failed to contact Drs. McKinley and Vaughan, or involve the Parents, before deciding on the additional testing to be done. *See* Parents'

---

unhappiness or depression; E. A tendency to develop physical symptoms or fears associated with personal or school problems." (*continued on next page*)

Brief at 37-39.  MSER § 9.8 contemplates that as part of an initial evaluation, a PET and other qualified professionals, as appropriate, shall "review existing evaluation data on the student, including evaluations and information provided by the parents of the student," and, "on the basis of that review, and input from the student's parents, identify what additional data, if any, are needed to determine[,]" *inter alia*, whether the student has a disability.  MSER § 9.8.  The PET agreed that District personnel would review the data provided by the Parents and get back to them by March 8 regarding additional testing.  District personnel did just that.  Further, Fetterman had been clear during the March 3 meeting that the District would in fact seek additional testing, including academic achievement testing.  Even assuming *arguendo* that the District committed a procedural violation in failing to contact Drs. McKinley and/or Vaughan prior to determining the additional testing to be done, as contemplated at the March 3 PET, the Parents make no argument that the omission made a difference.  *See* Parents' Brief at 37-39.  When the form arrived on March 10, they were too busy arranging for A.S.'s unilateral placement to review and complete it; they did not send it for review by their attorney until after A.S. left for Utah, and they then eventually signed and returned it.  "When . . . a procedural defect exists, we are obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA."  *MM ex rel. DM v. School Dist. of Greenville County*, 303 F.3d 523, 533 (4th Cir. 2002).  This particular omission, at most, falls into the latter category.

25.    The Parents next fault the District for failing to evaluate A.S. within forty-five days of receipt on March 31, 2003 of their signed consent-to-evaluate form, as required by MSER §§ 9.13 and 9.17.  *See* Parents' Brief at 39-42; MSER §§ 9.13(D) (PET shall require evaluator to submit report no later than forty-five school days following decision to evaluate), 9.17 (school unit must ensure that

---

MSER § 3.5.

evaluations are completed, eligibility determination is made and services are offered in accordance with an IEP within forty-five school days of receipt of parental consent to an initial evaluation).  But, as the Hearing Officer found:

A.      The Parents "chose to make finding a placement for the student a priority over having the student evaluated by the District, and thus did not return the consent to evaluate form until three weeks after they had received it, and two weeks after the student left the state."  Hearing Decision at 27.

B.      The District had no obligation to send its evaluators to Utah or to contract for evaluation by Utah-based third parties; rather, the Parents' decision to remove A.S. to Utah rendered her unavailable for testing.  *See id*. at 27-28; *see also, e.g., Patricia P.*, 203 F.3d at 469 (finding no clear error in district court's determination that mother's "lack of cooperation" in unilaterally placing child in Maine, not sending him back to Illinois for evaluation and offering only to permit school staff to travel to Maine to evaluate him "deprived the school district of a reasonable opportunity to conduct an evaluation of [the child] and fulfill its obligations under the IDEA"); *Great Valley Sch. Dist. v. Douglas*, 807 A.2d 315, 321-22 (Pa. Commw. Ct. 2002), *appeal denied*, 815 A.2d 1043 (Pa. 2003) ("We hold that among the burdens initially assumed by those unilaterally enrolling a child in a remote educational institution are burdens associated with the location of that institution.  Where a school district has not participated in a placement decision, no burden associated with the location can be assigned to it.  Thus, a school district cannot be compelled to assume any responsibility for evaluating a child while he remains outside [the state] in a unilateral placement").[41]

---

[41] The Parents seek to distinguish *Patricia P*. on the basis that, in *Patricia P*., the mother unilaterally removed her son from the state "without giving the district any opportunity to modify his IEP from the previous year or provid[ing] the district any opportunity to be involved in the private school placement."  Parents' Brief at 40.  The Parents posit that this case is more like *Oakwood Cmty. Unit Sch. Dist. No. 76*, 37 IDELR 59 (Ill. State Educ. Agency May 28, 2002), and *Lauderdale County Bd. of Educ.*, 37 IDELR 168 (Ala. State Educ. Agency Aug. 2, 2002), in which school districts dragged their feet identifying and evaluating students known to be in (*continued on next page*)

C.    The Parents thereafter balked at making A.S. available to the District for testing during subsequent home visits and even following her discharge in December 2004 from Moonridge. *See* Hearing Decision at 28.[42]  Although C.G. offered in August 2004 to send the results of Dr. Turek's evaluation to the District, she did not do so.  The Parents did not communicate with the District again until June 2005, when they filed their request for a due-process hearing.

In short, inasmuch as the District had a right to evaluate A.S. using its own evaluators, and the Parents did not make A.S. available for testing until September 2005, the District did not transgress A.S.'s IDEA rights by failing to evaluate her until then.[43]

26.    Finally, even assuming *arguendo* that – contrary to my recommendation – the court were to find that through October 2005 the District committed IDEA procedural violations collectively sufficient to have denied A.S. a FAPE, I would recommend that the court exercise its discretion to deny reimbursement of Moonridge costs.  As the District observes, *see* District's Brief at 14-15, federal statutes and regulations provide for limitation or denial of tuition-reimbursement awards if, "prior to the parents' removal of the child from the public school, the public agency informed the parents through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation[,]" 20 U.S.C. §

---

psychiatric crisis.  *See id.* at 40-41.  While the parents in *Oakwood* ultimately placed their daughter in an out-of-state residential facility, no question was presented whether the out-of-state placement rendered her "unavailable" for testing by the school district.  *See generally Oakwood*, 37 IDELR 59.  No such question was presented in *Lauderdale*, either.  *See generally Lauderdale*, 37 IDELR 168.  I perceive no material distinction between *Patricia P.* and the instant case.

[42] There is conflicting evidence whether Moonridge considered evaluation during the second home visit contraindicated.  *Compare* Record, Vol. IV at 721-22 (testimony of Moonridge counselor Horton that one purpose of a student's second home visit is to allow for any needed testing to occur) *with id.* at 787 (testimony of C.G. that Horton directed Parents not to make A.S. available for testing during second home visit).  The Hearing Officer evidently concluded – reasonably – that A.S., whose parents had taken her to Kents Hill during her second home visit, could have been made available then for testing by the District.  *See* Hearing Decision at 28.

[43] The Parents point out that the District did not warn them that out-of-state placement would, in its view, render A.S. "unavailable" for evaluation.  *See* Parents' Brief at 41 n.22.  However, the Parents, who were represented by an attorney as of the time of the March 3 PET meeting and the subsequent unilateral placement, do not make a persuasive case that  lack of such a warning should relieve them (*continued on next page*)

1412(a)(10)(C)(iii)(II); *see also* 34 C.F.R. § 300.148(d)(2) (formerly codified at *id*. § 300.403(d)(2)). Section 1415(b)(3), in turn, contemplates a written notice conforming to certain specifications. *See* 20 C.F.R. § 1415(b)(3); *see also, e.g.*, 34 C.F.R. § 300.503.

27.    The Parents rejoin that this limitation is by its terms inapplicable inasmuch as the requisite written notice of intent to evaluate A.S. was not furnished prior as of the time of the March 3, 2004 PET meeting. *See* Parents' Reply Brief at 12-13. It is less obvious to me than it is to the Parents that they "removed" A.S. from public school on March 3, prior to receiving written notice on March 10 of the District's request to conduct evaluations. While, on March 3, the Parents furnished oral and written notification of intent to make a unilateral placement of A.S., C.G. continued to call her in as absent, and CHRHS continued to record her as such, until March 15, 2004, *see* Record, Vol. I at 79, Vol. III at 658 (C.G. testimony), the day before A.S. departed Maine with her father to travel to Utah, *see id.*, Vol. IV at 791 (B.S. testimony). Thus, from all that appears, the Parents did not "remove" A.S. from public school until March 16, six days after receiving written notice of the District's intent to evaluate her. Regardless, District personnel made clear at the March 3 meeting that the Parents could expect the District to request to evaluate their daughter, and the Parents did in fact receive a consent-to-evaluate form on March 10, prior to taking A.S. to Utah on March 16. These circumstances fall within the spirit, if not the letter, of the limitation on tuition reimbursement contemplated by 20 U.S.C. § 1412(a)(10)(C)(iii)(II) and 34 C.F.R. § 300.148(d)(2). *See Greenland*, 358 F.3d at 160 (1997 IDEA amendments allowing court to reduce or deny tuition reimbursement in certain circumstances served "the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools"); *Schoenbach*, 309 F. Supp.2d at 84 ("The

---

of the consequences and risks of their own unilateral conduct.

1997 IDEA amendments gave effect and more structure to case law preceding the amendments that held that reimbursement for private school tuition depended on the parents cooperating with school authorities in determining the proper placement and educational plan for the child.") (citations and internal quotation marks omitted).[44]

## B.  Reimbursement of Chamberlain Costs

28.     The Parents next seek reimbursement of costs of their unilateral placement of A.S. at Chamberlain commencing in February 2006 on grounds that (i) the IEP offered by the District in October 2005 was not reasonably calculated to provide A.S. a FAPE, and (ii) Chamberlain was an appropriate placement.  *See* Parents' Brief at 23-35.

29.     The Parents assail the Hearing Officer's approach in assessing the appropriateness of the District's 2005 IEP offer as fundamentally flawed, asserting, *inter alia*, that (i) she should have analyzed whether the IEP as written was reasonably calculated to provide a FAPE, not whether an IEP could have been developed that did so, (ii) her decision actually supports a finding that the IEP as written was inadequate, given that she made clear the document required elaboration and clarification and she questioned the propriety of the District's offered placement at CHRHS, and, (iii) in any event, the proposed IEP was not reasonably calculated to provide a FAPE to A.S. even as District personnel testified it would have been supplemented.  *See id.* at 24-33.  The District counters, *inter alia*, that limitation of review to the IEP document is inappropriate in this case inasmuch as the PET process, in which the Parents fully participated, broke down when they made clear they were interested only in a residential placement, not in developing an IEP that could be implemented in any other setting.  *See*

---

[44] Inasmuch as I find that the District did not commit procedural violations through October 2005 sufficient to deny A.S. a FAPE, like the Hearing Officer I need not and do not reach the question whether Moonridge was a proper placement for A.S.  *See* Hearing Decision at 22-29.

District's Brief at 38-39. The Parents rejoin that any blame for breakdown in the PET process should be laid at the feet of the District. *See* Parents' Reply Brief at 3-5.

30. The Parents are correct that, as a general rule, the adequacy of an IEP should be judged solely with reference to the four corners of the written IEP document. *See, e.g., Knable*, 238 F.3d at 768 (district court erred in relying on hearing officer's finding that school had capacity to offer student an appropriate program instead of limiting its assessment to terms of draft IEP document itself; "The IDEA specifically requires school districts to provide parents a formal written offer before either initiating a placement for a disabled child or otherwise providing a FAPE to the child."); *M.C. ex rel. Mrs. C v. Voluntown Bd. of Educ.*, 226 F.3d 60, 67 (2d Cir. 2000) ("Since the IDEA requires a child's IEP Team to formulate a new IEP at least every year, the adequacy *vel non* of an IEP – here, M.C.'s IEP *for the ninth grade* – is to be judged on its own terms.") (citation omitted) (emphasis in original); *W.E.B. v. Appoquinimink Sch. Dist.*, No. Civ.A. 01-499-SLR, 2002 WL 31641642, at *3-*4 (D. Del. Nov. 21, 2002) (declining to consider evidence extrinsic to written IEP documents agreed on and signed by all parties); *Briere ex rel. Brown v. Fair Haven Grade Sch. Dist.*, 948 F. Supp. 1242, 1256 (D. Vt. 1996) ("[T]he issue before this Court is whether the May 20th IEP is reasonably calculated to provide educational benefits for Betsy, not whether an IEP might have been developed after Betsy's placement at the high school which would have complied with the IDEA."); *Falmouth Sch. Dep't*, 40 IDELR 83, at 330 (written IEP document "was woefully incomplete and was not made complete, and legally compliant, by statements that the details would be worked out after school began in the fall").

31. Nonetheless, as the District suggests, *see* District's Brief at 38-39, there is an important and sensible exception: Parents cannot brandish the incompleteness of an IEP document as a sword to prove denial of a FAPE to a child when the document is incomplete as a result of the parents' own

uncooperativeness, *see, e.g., MM*, 303 F.3d at 534-35 ("[I]t would be improper to hold the School District liable for the procedural violation of failing to have [an] IEP completed and signed, when that failure was the result of the parents' lack of cooperation."); *see also, e.g., Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.,* 349 F.3d 1309, 1319 n.10 (11th Cir. 2003) (where "parents significantly hindered or frustrated the development of an IEP, the district court may be justified in denying equitable relief on that ground alone"); *Doe v. Defendant I*, 898 F.2d 1186, 1189 n.1 (6th Cir. 1990) (parent could not be heard to complain that school district failed to complete a timely IEP when IEP's non-completion was attributable to parent's request that school allow student to perform on his own for a while).[45]  In  *MM*, it was undisputed that (i) the proposed IEP in question had never been signed or completed, (ii) MM's parents had attended two IEP team meetings regarding the proposed IEP and then had canceled a third, and (iii) the school district had requested notification from the parents when they were ready to reconvene and had received none.  *See MM*, 303 F.3d at 534.  The parents in *MM* cited *Knable* for the proposition that the draft IEP failed to satisfy IDEA requirements, entitling them to reimbursement of the costs of a unilateral private placement.  *See id*.  The *MM* court distinguished *Knable*, noting that whereas in  *Knable* no IEP team meeting even had been convened prior to the school's draft IEP offer, in  *MM*, the school district had been willing to offer a FAPE and had been attempting to do so, affording the parents a full and fair involvement in the process.  *See id*.  The court observed, "It is significant that there is no evidence that MM's parents would have accepted any FAPE offered by the District that did not include reimbursement for the Lovaas program.  As we have

---

[45] The District alternatively argues that, as a result of the Parents' uncooperativeness, "the Court should narrowly apply the IDEA's provision that reimbursement is available only to students 'who previously received special education and related services under the authority of a public agency.'"  District's Brief at 36 (quoting 34 C.F.R. 300.403(c)) (now codified at *id*. § 300.148(c)); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii).  As the Parents point out,  *see* Parents' Reply Brief at 12 n.9, the First Circuit has signaled its unwillingness to construe this language as precluding the reimbursement remedy in cases in which parents have requested but not yet received special education, *see Greenland*, 358 F.3d at 160 n.7 ("Despite the language of the statute, some legislative history suggests that Congress meant to include children who had requested but not yet received special needs services during their period in the public schools.").  The District cites no caselaw standing for the proposition that this language should be construed narrowly on account of (*continued on next page*)

noted, the District is not obligated by the IDEA to provide a disabled child with an optimal education; it is only obliged to provide a FAPE." *Id*. at 535.

32.     The Parents maintain – and Foreman confirmed on cross-examination during the due-process hearing – that the IEP document faxed to them on October 18, 2005 was the District's "final offer."  Record, Vol. IV at 747-48 (C.G. testimony), 825 (Foreman testimony).  Nonetheless, in context, Foreman cannot reasonably be understood to have meant that the IEP document itself was finalized.  The PET process was ongoing, and the IEP document faxed to the Parents clearly was not a completed document.  It referred, for example, to an "attached behavior plan," yet none was attached. *See id*., Vol. I at 158, Vol. IV at 826 (Foreman testimony).  Foreman testified at hearing that the District would have entered into a consultants' contract, preferably with Dr. Miller, and worked with both Dr. Miller and the family to design safety/crisis and behavior/positive-support plans for A.S. *See* Record, Vol. IV at 811.  She envisioned "that we would have to front load this pretty significantly in terms of hours that we'd want to contract with Dr. Miller about, so that we could have a plan for re-entry into a program – a public school program or into a combination of Zenith – that's a public school program [–] and special education[.]" *Id*.  Significantly, consistent with Foreman's testimony, minutes of the October 12, 2005 PET meeting (which the Parents attended) indicate that the PET contemplated that "[i]t would be useful to include Dr. Miller" in devising a crisis plan for A.S. and that "target areas for [a] positive behavior support plan" were to be identified with Dr. Miller. *Id*., Vol. I at 150.  At the meeting, the Parents accepted the "components" of the IEP. *See id*.  In addition, although the Parents contend that the District's final offer was to place A.S. specifically at CHRHS, *see* Parents' Brief at 26, a preponderance of the evidence supports a finding that the precise placement was not finally resolved, apart from an expression of consensus on the part of District personnel that A.S.

---

parental uncooperativeness.  Accordingly, I decline to so construe it.

could be educated in a public-school setting, with Zenith seeming to them as though it would be a good fit, *see, e.g.*, Hearing Decision at 21, ¶ 45; Record, Vol. IV at 748 (C.G. testimony), 798-99 (B.S. testimony), 813 (Foreman testimony).

33.     One reasonably can infer, as did the Hearing Officer in this case, that these crucial portions of A.S.'s educational plan were left undeveloped not because the District – which itself had restarted the PET process – was unwilling to devise them, but rather because the PET process imploded during the contentious October 20, 2005 meeting. *See* Hearing Decision at 21, ¶ 45, & 31. Each side blames the other for the breakdown. *Compare, e.g.*, District's Brief at 38 *with* Parents' Reply Brief at 4. Nonetheless, as discussed above, the Hearing Officer supportably found that the process was derailed as a result of the Parents' insistence on a residential therapeutic placement. *See* Hearing Decision at 21, ¶ 45. In this, the Parents were like the parents in *MM*, who would not have accepted any FAPE offered by the school district that did not include their preferred component. *See MM*, 303 F.3d at 535.[46] In these circumstances, the Hearing Officer did not err in peering beyond the four corners of the IEP document to assess whether the District "was willing to offer [A.S.] a FAPE, and [whether] it had attempted to do so." *Id*. at 534. Viewing the offer through that widened lens, she correctly concluded that it passed muster.

34.     For purposes of substantive analysis, "a FAPE has been defined as one guaranteeing a reasonable probability of educational benefits with sufficient supportive services at public expense." *G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 948 (1st Cir. 1991). As the First Circuit has further elaborated:

---

[46] The Parents seek to distinguish *MM*, observing that in *MM* there was no dispute that the parents had walked away from the PET process and refused to come back to the table, while, in this case, the final PET meeting ended when the District cut off further discussion and announced that the draft IEP constituted its final program offer. *See* Parents' Reply Brief at 4-5. Accordingly, they reason, the IEP process in this case did reach an end point, at least insofar as the District was concerned. *Id*. at 5. Foreman admitted at hearing that she did indeed shut down the October 20, 2005 PET meeting; however, she indicated that she did so because further (*continued on next page*)

The IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

The IDEA also articulates a preference for mainstreaming. Translated into practical application, this preference signifies that a student who would make educational progress in a day program is not entitled to a residential placement even if the latter would more nearly enable the child to reach his or her full potential. And, moreover, when the bias in favor of mainstreaming is married to the concepts of appropriateness and adequacy, it becomes apparent that an IEP which places a pupil in a regular public school program will ordinarily pass academic muster as long as it is reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993) (citations and internal quotation marks omitted). *See also, e.g., Milford Sch. Dist. v. William F*., No. 97-1506, 1997 WL 696108, at *5 (1st Cir. Nov. 10, 1997) ("A FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice, or even the best choice.") (citation and internal punctuation omitted).

35.     "An appropriate IEP must contain[, *inter alia*,] statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *MM*, 303 F.3d at 527; *see also* 20 U.S.C. §1414(d)(1)(A)(i). The Parents fault the District's IEP for (i) provision of special-education services for only twenty-five percent of A.S.'s school day, leaving her in mainstream classes the remaining seventy-five percent of her day without supports or structure, (ii) lack of "even a single minute of the therapeutic services that A.S. so desperately and obviously needed to benefit from her education[,]" (iii) lack of services to support A.S.'s attendance at school,

---

discussion was fruitless, the Parents having made clear their unwillingness to settle for any public-school placement and their insistence (*continued on next page*)

(iv) lack of provision of a positive behavior-support plan of any type, even though every member of the PET agreed this was an essential component of any educational plan for her, and (v) lack of any crisis or safety plan to deal with any issues that might arise as a result of A.S.'s suicidality.  *See* Parents' Brief at 30-32.  "I[n] sum," the Parents assert, "in virtually every area in which A.S.'s educational success is dependent on therapeutic or behavioral supports, the IEP is completely lacking in both substance and detail."  *Id*. at 32.

36.      Yet, as the Hearing Officer found, no one disputed that A.S. needed "a very structured environment and considerably more support than she had when she attended CHRHS as a regular education student."  Hearing Decision at 31.  At the October 12, 2005 PET meeting, the Parents themselves approved of the basic components of A.S.'s IEP: (i) development of organizational skills, (ii) development of a positive behavioral support plan, (iii) achievement and maintenance of passing grades, and (iv) good school attendance.  *See* Record, Vol. I at 149-50.

37.      The District's proposed IEP offered significant structure and support, including (i) provision during "mainstream" class time of many of the classroom modifications proposed by Dr. Slap-Shelton (among them, preferential seating, provision of teacher lecture notes when possible, and extra time as needed to complete tests and other skills assessments), (ii) provision during the remaining twenty-five percent of the school day of direct special-education assistance to develop organizational strategies and complete homework, and (iii) development, in conjunction with the family and Dr. Miller, of a behavioral-support plan and crisis/safety plan, with ongoing psychiatric consultation as needed.  *See id*. at 151, 153, 157-58, Vol. IV at 811-12, 826 (Foreman testimony).  I concur with the Hearing Officer that, with development of the behavioral supports contemplated by the

---

on a residential therapeutic placement.  *See* Record, Vol. IV at 813.

PET and clarification of the services to be provided via "psychiatric consultation as needed," the IEP would have been reasonably calculated to permit A.S. to make educational progress.[47]

38.    Nor did the Hearing Officer err in determining that a public-school placement, as contemplated by District personnel, was appropriate for A.S.  She heard conflicting expert testimony whether this was feasible: Dr. Miller expressed the opinion that A.S. could make educational progress at that point only within the confines of a residential therapeutic placement, *see id*., Vol. IV at 730-31; Dr. Slap-Shelton testified that the proposed IEP could be a reasonable plan once A.S. was stabilized, *see id*. at 708; Dr. McCabe expressed the view that A.S. did not require a residential placement, but rather, her needs could be met in public school, *see id*. at 881; Foreman testified that the District had accommodated students with "very, very challenging profiles" in public school and could do so with A.S., *see id*. at 813; and the report of Dr. Turek, who performed an independent evaluation of A.S. in Utah at the Parents' request, reasonably could be interpreted as suggesting that public-school attendance was feasible for her, *see id*., Vol. I at 278.  Given the IDEA's strong preference for mainstreaming whenever possible, neither District personnel nor the Hearing Officer can be faulted for resolving this evidentiary conflict in favor of the least restrictive placement.  *See, e.g., Abrahamson*, 701 F.2d at 227 ("It follows from Rowley that the [IDEA] does not authorize residential care merely to enhance *an otherwise sufficient* day program.  A handicapped child who would make educational progress in a day program would not be entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential.") (emphasis in original); *see also, e.g., Oberti ex rel. Oberti v. Board of Educ*., 995 F.2d 1204, 1207 (3d Cir. 1993) ("We construe IDEA's mainstreaming requirement to prohibit a school from placing a

---

[47] While the District did not propose to provide direct therapeutic services for A.S., it contemplated the family's continuation of her private therapy with Dr. Miller, with whom it proposed to engage in an ongoing consulting relationship to help it provide behavioral support and crisis/safety support for A.S. at school and to attend school.  *See* Record, Vol. IV at 811-12, 826 (Foreman testimony).

child with disabilities outside of a regular classroom if educating the child in the regular classroom, with supplementary aids and support services, can be achieved satisfactorily."); *compare, e.g., Mrs. B. ex rel. M.M. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997) ("As long as the child is properly educable only through a residential placement, when the medical, social or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible for the costs of the residential placement.") (citation and internal quotation marks omitted).[48]

39.     In sum, inasmuch as (i) the District's proposed IEP document was incomplete as a result of a breakdown in the PET process, (ii) the PET process broke down in the face of the Parents' insistence on a residential therapeutic placement and concomitant refusal to place A.S. in public school, and (iii) the proposed IEP, if developed in the manner envisioned by the District, could have provided a FAPE to A.S. within the public-school setting, the Parents have failed to carry their burden of establishing that the IEP offered by the District in October 2005 was not reasonably calculated to offer A.S. a FAPE.  Accordingly, the family is not entitled to reimbursement of tuition and other costs of the unilateral private placement at Chamberlain.[49]

### C. Compensatory Education

40.     The Parents finally seek a remedy of compensatory education, positing that:

---

[48] The Parents point out – and I agree – that parents need not meet the "least restrictive environment" test in demonstrating that a private placement is proper under the IDEA.  *See* Parents' Brief at 27-28; *see also, e.g., Rome Sch. Comm. v. Mrs. B.*, 247 F.3d 29, 33 n.5 (1st Cir. 2001) (propriety of a unilateral placement "is a different issue, and one viewed more favorably to the parent, than the question whether this residential placement was required in order to provide a free appropriate education to DC."); *Warren G. v. Cumberland County Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999) (agreeing that "imposition of the least-restrictive environment requirement on private placements would vitiate the parental right of unilateral withdrawal"; noting, "An appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement."); *Babb ex rel. Babb v. Knox County Sch. Sys.*, 965 F.2d 104, 108 (6th Cir. 1992) (same).  Nonetheless, in discussing the issue of placement, the Hearing Officer was addressing the threshold question whether a residential placement was necessary to offer A.S. a FAPE, not the question whether the Chamberlain placement (or some other particular private placement) was proper.  *See* Hearing Decision at 29-34.

[49] Like the Hearing Officer, I need not and do not reach the question whether Chamberlain was a proper placement for A.S.  *See* Hearing Decision at 29-34.

A.S. lost significant educational opportunities because of Five Town's failure to offer her a free appropriate education that would timely address her emotional disabilities and enable her to receive educational benefit. Due to the emotional decline resulting from her disabilities, A.S. did not attend school at all in February or March 2004 and again was denied appropriate services at the start of the 2005-2006 school year, until Plaintiffs were able to complete her unilateral placement at Chamberlain School in February 2006, following a period of psychiatric hospitalization at Spring Harbor. A.S. made no academic or other educational progress during these period of non-attendance. In addition, because A.S. was not receiving the full therapeutic supports she needed during both these periods, her emotional health continued to decline. . . . The Court, therefore, should conclude that A.S. is entitled to a compensatory education award, in the form of future publicly-funded services designed to place A.S. in the position she would have been in now had Five Town not twice defaulted on its IDEA responsibilities.

Parents' Brief at 44 (footnote omitted).

41.    Inasmuch as I have recommended that the court find the District did not default on its IDEA responsibilities during any relevant time period in such a manner as to deny A.S. a FAPE, I recommend that the court also deny the requested remedy of compensatory education. *See, e.g., Lesesne ex rel. B.F. v. District of Columbi*a, 447 F.3d 828, 833 (D.C. Cir. 2006) ("When a school district deprives a disabled child of FAPE in violation of IDEA, a court fashioning 'appropriate' relief under 20 U.S.C. § 1415(i)(2)(C)(iii) may order compensatory education, i.e., replacement of educational services the child should have received in the first place.") (citation and internal punctuation omitted); *Department of Educ. v. E.B. ex rel. J.B.*, No. 05-00543 ACK/BMK, 2006 WL 1343681, at *4 (D. Haw. May 15, 2006) (observing that compensatory education is a form of remedy for violation of the IDEA rather than a substantive claim).[50]

### III. Conclusion

For the foregoing reasons, I recommend that the instant appeal be **DENIED**.

---

[50] Inasmuch as I find there is no underlying IDEA violation entitling the Parents to the remedy of compensatory education, I need not and do not address the parties' dispute over whether such an award appropriately can encompass tuition reimbursement. *See* Parents' Brief at 44-45 n.24; District's Brief at 43-44.

## <u>NOTICE</u>

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 12th day of February, 2007.

<u>/s/ David M. Cohen</u>
David M. Cohen
United States Magistrate Judge
